## COURT OF APPEALS.

### February, 1922.

### THE PEOPLE v. JAMES JOYCE.

(233 N. Y. 61.)

(1) MURDER—INSANITY—SPECIAL PLEA NOT REQUIRED TO INTRODUCE EVIDENCE OF INSANITY OR LACK OF MENTALITY.

A defendant indicted for the crime of murder in the first degree is not required as a prerequisite to the introduction of evidence of insanity or lack of mentality to file a special plea of such defense. The exclusion of evidence tending to disclose lack of mentality on the part of the defendant bearing upon the alleged confessions made by him was error.

(2) SAME—CROSS-EXAMINATION OF DEFENDANT CHARGED WITH MURDER—MUST NOT BE EXTENDED SO AS TO CREATE PREJUDICE.

While a prosecuting officer is permitted extended scope in the cross-examination of a defendant called in his defense, such cross-examination when permitted to such extent as may tend to create a prejudice against a defendant charged with homicide constitutes error.

APPEAL from a judgment of the Queens County Court, rendered May 27, 1921, upon a verdict convicting the defendant of the crime of murder in the first degree.

*William E. Kennedy*, for appellant. The case against the defendant should have been dismissed at the end of the People's case or at least at the end of the entire case. (People v. Beckwith, 108 N. Y. 72; Ruloff v. People, 18 N. Y. 198; People v.

Gallo, 149 N. Y. 106; 2 Chamberlayne on Ev. 1600; People v. Bagley, 16 Wend. 53.) The court erred in not allowing the mental condition of the defendant to be given to the jury for their consideration. (People v. McIlvaine, 125 N. Y. 596; Ostrander v. People, 28 Hun, 38; Freeman v. People, 4 Den. 10; State v. York, 37 N. H. 181.) The court erred in allowing the question: " While you were in the army were you locked up ? " (People v. Buffom, 214 N. Y. 53.)

*Dana Wallace, District Attorney (Joseph Lonardo, of counsel), for respondent.* There is proof in addition to the confessions of the actual commission of the robbery or attempt. (People v. Sanducci, 195 N. Y. 361; People v. Harris, 209 N. Y. 70; People v. Roach, 215 N. Y. 592; People v. Sullivan, 173 N. Y. 122; People v. Giusto, 206 N. Y. 67; People v. Friedman, 205 N. Y. 161; People v. Chapman, 224 N. Y. 463; People v. Molineux, 168 N. Y. 268; People v. Thaw, 219 N. Y. 39; People v. Richardson, 222 N. Y. 103.) The court properly rejected proof of defendant's insanity. (People v. Carlin, 194 N. Y. 448; People v. Silverman, 181 N. Y. 235; People v. Farmer, 194 N. Y. 251; People v. Kennedy, 159 N. Y. 346; People v. Randazzio, 194 N. Y. 148; People v. Buffom, 214 N. Y. 53; People v. Egnor, 175 N. Y. 719; Cox v. People, 80 N. Y. 515; People v. Wertz, 37 N. Y. 309; Com. v. Bona, 170 Mass. 41; Chamberlayne on Ev., § 1530.) Since defendant was not suffering from a mental abnormality rendering his confessions involuntary, as a matter of law, there being no infirmative considerations and no conflict as to that, the admission thereof and the exclusion of the medical testimony was proper. (People v. Kennedy, 159 N. Y. 346; People v. Randazzio, 194 N. Y. 148.) The question as to whether defendant was ever locked up in the army was relevant for the purpose of eliciting matters tending to impeach defendant's credibility and to show any criminal act in his history. (People v. Johnston, 228 N. Y. 332; People v. Webster, 139 N. Y. 73.)

HOGAN, J.:

About 11 o'clock in the evening of July 1, 1920, one Adam Zittell, the keeper of a delicatessen store at No. 604 Broadway, Astoria, was shot and as a result thereof died within a few minutes thereafter. The crime was shrouded in more or less mystery, and while the public authorities were active in an attempted discovery of the perpetrators of the crime, so far as the record discloses the clues cannot be said to have been such as to justify any well-founded suspicion that defendant was connected with the homicide. Four weeks later, on July 30th, a police officer held a warrant for the arrest of defendant upon a charge of grand larceny. Defendant was arrested thereunder at a lunch room located opposite the railroad station in Jamaica about 1 o'clock in the afternoon and taken to the Seventy-fourth Precinct Station, Brooklyn, arriving there soon after 2 o'clock. Later defendant was taken to the Seventy-sixth Precinct Station, to the One Hundred and Eleventh Precinct Station, Astoria, to Mercer Street Station in Manhattan, and finally to the delicatessen store in Astoria, formerly conducted by Mr. Zittell. The various trips occupied some twelve hours. At the various stations, officers and detectives of the police force were in attendance. Defendant was interrogated by certain of the officers and in their presence relative to the murder of Mr. Zittell. A number of them testified as witnesses for the prosecution as to statements made to them or in their presence by defendant wherein he acknowledged participation in the murder of Mr. Zittell, and further that upon the last trip to Astoria defendant illustrated to some of them, in the delicatessen store, the manner in which the crime was committed. Soon thereafter defendant was arraigned in the Magistrate's Court upon a charge of murder. Up to that time defendant assumed he was charged with grand larceny, to which charge he asserted he was innocent.

December 28, 1920, defendant was indicted jointly with John Doe, the name presumably intended to represent one

Tony, asserted to have been mentioned in defendant's statements, for the crime of murder, first degree. So far as appears no person other than defendant has been apprehended for the crime. Defendant was placed on trial May 3, 1921, and the result of that trial was a disagreement. Upon the second trial the jury rendered a verdict of guilty as charged in the indictment.

A detailed narration of the statements made by defendant will be omitted save only so far as may be necessary to disclose views entertained as to the statements in general and bearing upon the conclusion we have reached upon the appeal herein.

If the statements made or alleged to have been made by defendant were eliminated from the record, the conviction of defendant would not be supported by evidence tending in the slightest degree to convict him with the crime of murder.

Defendant was a witness on the trial and denied that he had made the statements attributed to him, that he had ever been in Astoria prior to his arrest, or that he had knowledge of the murder of Mr. Zittell until informed of the same by the officer of the police department who arrested him on the charge of grand larceny and who related to him in detail the circumstances surrounding the crime and the manner in which the same was committed while on the way to the First Precinct Station, and again in the various other precinct stations to which he was taken. He also testified that various officers, in the endeavor to coerce him to admit participation in the crime of murder, had ill-treated and assaulted him. The evidence of defendant was contradicted by the officers and they severally testified that all statements made by defendant were voluntary. The question of fact thus presented was solved by the jury adverse to defendant. The conviction of defendant, based as it is on the confessions of defendant, necessitates a reference to certain facts relating to the confession.

The theory of the prosecution was that defendant, immediately upon his arrest upon a charge of grand larceny, without

suggestion or intimidation by the officer making the arrest, voluntarily made a statement to the officer detailing the murder of Mr. Zittell and his participation in the crime. Examination of records in homicide cases justifies the assertion that the prevailing custom where statements are thus made is to proceed at once to the office of the public prosecutor, where the accused is advised of his rights, then examined by the district attorney, the proceedings taken by a stenographer or written out at length, read over to the accused, correction made if necessary, and his signature obtained to the statement if he is willing to sign the same. Such procedure was not adopted in the present case. For some reason it was deemed necessary to take defendant from one precinct station house to another, as heretofore referred to, covering a period of some twelve hours, that the statements of defendant might be made in the presence of various officers. The First Precinct Station was reached about 2 o'clock in the afternoon, an hour when the public prosecutor or one of his assistants would doubtless be at the office, but defendant was not taken there until about half-past 9 the following morning. Up to that time no written statements had been prepared or made, neither had the various statements attributed to defendant been reduced to writing. Certain of the officers testified that they did not have defendant make a statement in writing because he confessed " so easily." The detective who took defendant to the office of the district attorney testified that defendant there made a statement, but the same was not put in writing; " it is customary for a district attorney to take a statement when a man goes through a case as he did, but the district attorney didn't take it on account he never thought this man would deny that statement." A captain of one of the precincts who had been connected with the police force for twenty-five years, while testifying as to statements made to him by defendant, stated he had asked defendant many questions and it was necessary for him to repeat questions to defendant, " for this reason, the man confessed so easily and

28

I was rather impressed with the fact that he wasn't right first off to be honest with you," and further, " I told Detective Shalow to take defendant to the district attorney's office and not to get any written confession from him." In this connection, evidence of the defendant as to what transpired in the district attorney's office becomes important. Defendant testified that Detective Shalow told Mr. Barry, the assistant district attorney, how the crime was committed; that Mr. Barry asked him, defendant, " Is that right? " and that he replied " no; " that he never told the detective such a story and he did not know anything about the crime; that Mr. Barry then told the detective " to go out and get the offense off the right man. You have brought an innocent man into my office and try to say he was the man that was there. You are trying to shield up somebody two other men by bringing this man here. You are trying to force this man to say something about this crime which he doesn't know anything about." Mr. Barry was not called as a witness to contradict that statement of defendant.

Attention has been called to the facts referred to for the purpose of illustrating certain unusual features of the case.

Assuming for the purposes of this case that defendant, immediately upon his arrest upon a charge of larceny, without suggestion or intimidation from the officer making the arrest, voluntarily confessed participation in the crime of murder and detailed the circumstances connected with the crime not only to that officer but to a number of police officers and detectives, we have presented a situation quite out of the ordinary, so unusual in character that officers of the police department of years of experience in the administration of criminal law, the apprehension of offenders and shrewd and active in the discovery of evidence, were surprised at the statements made to them by defendant. To again quote the testimony of one captain of police, who had an experience of twenty-five years in the department, " the man confessed so easily I was rather impressed with the fact that he wasn't right, first off to be

honest with you." Other of the officers testified defendant confessed so easily they did not believe he would ever deny the statements made by him. In connection with the stated facts there remains the circumstance that no statement was taken and reduced to writing by the officers or the district attorney and the testimony of defendant which was uncontradicted as to what transpired in the office of the district attorney, from which an inference may be drawn that the prosecuting officer hesitated to procure a statement from defendant, which inference is strengthened by the fact that preceding the trial of defendant he was visited at the jail by two doctors, one of whom represented the People. Of some moment likewise is the fact that a jury upon a former trial, where substantially the same evidence adduced by the People upon the trial under review was presented, was unable to agree upon a verdict. The statement that the present case is somewhat extraordinary is fully justified.

In People v. Buffom (214 N. Y. 53, 57) Chief Judge Bartlett, writing for this court, discussing the law applicable to confessions, said: " The annals of criminal jurisprudence, however, abound in cases of false confessions induced by the hope of escape from punishment or the mitigation of punishment or of some other benefit to be gained by the confessing party. Indeed, there have been instances of false confessions for which it was impossible to assign any reasonable motive whatever."

Burrill on Circumstantial Evidence (page 215) writes: " Indeed there are cases on record, in which juries have been led to the conviction of innocent persons, by a species of evidence which might well be regarded as stronger than even the direct testimony of any witness, leaving no room for any possible doubt; namely, the voluntary and deliberate confessions of the accused persons themselves." " It is not even certain," to use the language of Mr. Justice Story (U. S. v. Gilbert, 2 Sumner, 19, 26), " that criminals who, in capital cases, plead

guilty, and, by confession of their guilt in open court, submit
to the sentence of the law, are always guilty of the offense.
Cases have occurred in which men have been accused and tried,
and convicted of murder, upon their own solemn confession in
a court of justice; where it has been afterwards ascertained
that the party could not have been guilty; for the person sup-
posed to be murdered was found to be still living, or lost his life
at another place, and at a different period." The subject has
likewise been treated in Wharton's Criminal Evidence (8th
ed., § 627), Will on Circumstantial Evidence (pp. 118, 119),
Gillett on Indirect and Collateral Evidence (§ 116), Chitty on
Criminal Law (5th American ed., p. 570a). We may also
call attention to an event of recent date where, according to
reports in the public press, individuals voluntarily confessed
that they had perpetrated the bomb explosion in Wall street,
yet careful investigation disclosed the falsity of their
confessions.

We pass to a consideration of certain proceedings and rulings
of the trial justice which resulted in error of law prejudicial
to defendant. Counsel for defendant in his opening of the case
to the jury stated: " I will show that this man has the mind
of a youth of nine or ten years." The district attorney: " I
object, it is not a matter of defense in this case as to the con-
dition of defendant's mind, if that was made an issue we would
be prepared to meet it."

By the court, addressing counsel for defendant: " He has
not claimed to be insane."

After some colloquy, counsel continued: " We will prove by
competent evidence that the mind that this defendant has, is a
mind that if you or any other man had a stronger mind,
insisted, talked well, pleaded, threatened, that his mind would
succumb."

Counsel for defendant having thus assured the jury that he
would establish that defendant had the mind of a child, from
which he would argue that even assuming defendant made the

statements attributed to him, such statements were the result of suggestion and lack of comprehension on his part of what he was stating, or the result of an illusion that he was a hero, was, however, denied the privilege of making any proof of defendant's mentality.

Dr. Lahey, a specialist in nervous and mental diseases, was called as a witness for defendant. Having testified as to his experience and that on the previous Saturday he had examined defendant in Queens county jail, he was then asked to tell the condition in which he found defendant. The district attorney objected to the question, but stated no grounds of objection or criticism as to the form of the question. The court then stated to counsel for defendant: "I don't understand the theory, Mr. Kennedy, at all; there is no defense of insanity interposed." The jury was thereupon excused. Counsel for defendant then undertook to explain his theory, that he intended to prove by the doctor that defendant's mind was such that from the test he made he had the mind of a boy between the age of ten and twelve years and that being so his mind is easily influenced by people who have stronger minds, and that from beating, and from talking to him by the officers, they would be able to get his mind in such a condition that he would not know what he was saying or if he did say something it would not be true. Counsel continued: "I would like to have it put upon the record that this doctor examined this defendant in the presence of two other doctors, one assigned by the district attorney." By the Court: "If he (defendant) did not positively assert that he made no such statements to the officers at all, if he admitted he had told these people these things, that he was either tweedled into it or tracked or tricked into it that would be relevant testimony, but here he said he never made any such statement at all to any of the officers and the only theory you can base it on is that the testimony which he himself has given is false and I wouldn't want to assume that for you. I will sustain the district attorney's objection." Counsel for

defendant noted an exception. The mother of defendant was a witness on his behalf and was asked if James, the defendant, had a fall when he was a little boy. Objection thereto by the district attorney was sustained and an exception noted. The exceptions were well taken.

The trial justice was in error in suggesting that defendant was required to file a special plea of insanity or lack of mentality as a prerequisite to the introduction of evidence of insanity or lack of mentality. (People v. McElvaine, 125 N. Y. 596; People v. Carlin, 194 N. Y. 448.) If defendant was what is known in medical jurisprudence as a moron, *i.e.,* one whose intellectual development proceeds normally up to about the eighth year of age, then arrested, never exceeds that of a normal child of about twelve years, evidence of such fact was material for consideration by the jury. The fact that defendant denied that he made the statements testified to by the officers was not a legitimate reason for a rejection of the evidence. Such denial would not conclude him from offering such proof or his counsel from arguing that in the event he made such statements he was not of sufficient mentality to understand what he was stating or that his mind was controlled by a superior force or intellect. The question put to his mother was likewise competent and an answer thereto should have been permitted.

Upon cross-examination of defendant, too much latitude was permitted the district attorney as to the career of defendant and his guilt of other offenses. One illustration will suffice to disclose error. The defendant had been in the army in the World War for nearly two years, a portion of the time in France. Speaking of his presence at a place he called St. Agnes, he was asked: " You weren't in prison any during that time, were you ? " Again he was asked: " While you were in the army were you locked up ? " Objection was duly made, overruled, and exception taken. The district attorney was permitted to inquire over objection and exception for two pages of the record as to whether defendant was imprisoned in France,

as to whether he did anything there for which he was imprisoned. The objection to that class of evidence was well taken. Assume that defendant had omitted to salute his superior officer and the latter ordered him to the guard house for a few hours, such omission might be considered a breach of military discipline rather than a crime and his brief detention in the guard house would scarcely be held equivalent to a conviction of a crime.

A material witness for the People in this case unable to give bail to insure attendance upon the trial might be detained in the Queens county jail for months and draw a *per diem* compensation from the county while so detained. Such detention in jail would not at some future time admit of examination of such witness as to such detention for the purpose of showing him to have been guilty of some wrong or crime.

While the rules of evidence permit a prosecuting officer extended scope in the cross-examination of a defendant on trial, the courts, particularly in homicide cases, will not approve of questions improperly framed and insisted upon by repetition which may tend to create a prejudice against a defendant in the minds of the jury by reason of a failure on the part of the witness to answer directly or a refusal on his part to answer the same.

The judgment of conviction should be reversed and a new trial ordered.

CRANE, J. (concurring):

I agree in the opinion of Judge Hogan. There is another ground, however, upon which I think this conviction should be reversed. The defendant was convicted upon what is now commonly termed a felony murder. Under section 1044 of the Penal Law the defendant was convicted of murder in the first degree in having killed or participated in killing Adam Zittell while he, the defendant, was in the commission of the crime of larceny or robbery. The judge did not charge the jury in all

the degrees of criminal homicide, but told them that the defendant was guilty of murder in the first degree or not guilty.

The only evidence against the defendant that he or his associate was committing or attempting to commit larceny or robbery was the defendant's confession. There was no evidence of anything being broken about the place, the store of Zittell, or of anything being stolen or any property found upon the defendant indicating that a larceny had taken place. Under section 395 of the Code of Criminal Procedure, a confession of the defendant can be given in evidence against him, but is not sufficient to warrant his conviction without additional proof that the crime charged has been committed. In order to convict a defendant of the crime of murder in the first degree in having killed Zittell while in the commission of a felony, it was necessary for the People to prove by competent evidence the commission of or the attempt to commit the felony. How could the homicide occur in the commission of a felony if the felony be not proved? The felony, that is, the larceny and robbery, could not be proved by the confession of the defendant alone. If the defendant were being tried for the collateral felony and his confession were the only evidence against him, an acquittal would be compulsory. In People v. Hüter (184 N. Y. 237, 244) this court said: " In order, therefore, to constitute murder in the first degree by the unintentional killing of another while engaged in the commission of a felony, we think that while the violence may constitute a part of the homicide, yet the other elements constituting the felony in which he is engaged must be so distinct from that of the homicide as not to be an ingredient of the homicide, indictable therewith or convictable thereunder." (See, also, People v. Spohr, 206 N. Y. 516, 521; People v. Patini, 208 N. Y. 176, 180; People v. Marwig, 227 N. Y. 382, 386.)

If this defendant had been tried for murder in the first degree in having killed Zittell with premeditation and intent to kill, the finding of Zittell's body with the wounds upon it would

have been sufficient corroboration to comply with section 395 of the Code of Criminal Procedure. (People v. Brasch, 193 N. Y. 46; People v. Roach, 215 N. Y. 592.) Under such a charge, however, the jury could have found the defendant guilty of murder in the first degree or in the second degree or manslaughter in the first degree or second degree, and the court would have been compelled to so charge them. In the case where the killing is done while in the commission of a felony there can be but one verdict if guilty, and that murder in the first degree. Premeditation and intent are no part of such a charge. It seems right and fair, therefore, that the felony committed or attempted resulting in death should first be established by evidence sufficient at law to convict of such felony. As stated, a confession alone without any corroboration as to the commission of the collateral felony is insufficient.

While this point has not been directly passed upon so far as I can find in this State, yet in similar cases there has been other evidence corroborating the confession as to the commission of a felony at the time of the killing. Such corroboration consisted of evidence showing breaking of doors or windows or the possession of stolen property or other marks or incidents indicating that a larceny or burglary had been attempted or committed. (People v. McGloin, 91 N. Y. 241; People v. Meyer, 162 N. Y. 357, 370; People v. Giusto, 206 N. Y. 67, 77; Wistrand v. People, 213 Ill. 72; Andrews v. People, 117 Ill. 195.)

As before stated in this case, we have these two things and these two only, the confession of the defendant and the finding of Zittell's body in his store. The defendant in his confession says that he and his associate entered the store with intent to rob or steal. There is no other evidence of larceny or robbery except this confession. To my mind the proof is utterly lacking under section 395 of the Code of Criminal Procedure to establish the commission of a felony separate and distinct from the killing and the defendant should not have been convicted

for this reason of murder in the first degree for having killed Zittell while in the commission of a felony.   The finding of the body of Zittell was sufficient corroboration of the confession to make out murder in the first degree committed with premeditation and deliberation, but here the jury would have the right and the privilege to convict the defendant of any one of the four degrees of felonious homicide.

The finding of the body alone would not be corroboration of larceny or robbery or sufficient to sustain a conviction of murder in the first degree under the charge of the court that the jury must convict in such degree if they found the defendant guilty of any crime.

For these reasons I think the judgment of conviction should be reversed.

HISCOCK, Ch. J., CARDOZO, POUND, McLAUGHLIN, and ANDREWS, JJ., concur with HOGAN, J.; CRANE, J., reads concurring opinion, with whom McLAUGHLIN, J., also concurs.

Judgment of conviction reversed, etc.