Bernard Tomson, J.
The defendant moved to suppress statements which she asserts were involuntarily made. (CPL 710.20, subd 3). The defendant alleged no external duress in support of her motion, but relies instead upon internal subjective pressures. Her position makes the determination here one of first impression in this State. To resolve the question a hearing was held and an initial oral decision was rendered on November 3, 1975. The following are the court’s formal findings and conclusions required by statute. (CPL 710.60, subd 5),
On September 30, 1974 the body of Burr Hollister was found on the floor of the office he occupied as law secretary to Justice Bertram Harnett of the New York State Supreme Court. He had been shot in the head. When Justice Harnett learned of the death he informed the defendant, Jo-Anne Brown. She and her children had resided with the deceased. Shortly thereafter the defendant arrived at the Supreme Court building looking nervous and smoking excessively. During a private conversation with Justice Harnett she spoke calmly and clearly although her thoughts seemed disjointed to Justice Harnett. The defendant also spoke to Detective Rauff and Police Officer Fran Galasso.
Though not under arrest, the defendant was escorted to police headquarters where she was advised of her rights in compliance with Miranda v Arizona (384 US 436). She was aware that an attorney had been retained for her, but she had not yet spoken with him. Nevertheless, the defendant refused to answer police questions asserting that she had been advised not to talk to the police. She did talk with Officer Galasso and discussed in general terms her relationship with the deceased. Her conduct appeared rational and she was alert, polite and co-operative to a degree. Her conversation was coherent and she appeared to understand what was occurring.
The defendant’s attorney eventually arrived at police headquarters and they conferred. The defendant then consented to answer questions and gave a detailed account to Detective Rauff of her activities on the previous day. A "Q & A” was also obtained. Her conduct appeared normal. She was attentive and responsive both to the questions posed and to the advice of counsel.
After the questioning the defendant returned home. Shortly *341 after her arrival she was met there by Assistant District Attorney Grennan, Detective Sergeant Dempsey and Detective Rauff. They had come to pick up certain items which the defendant had agreed to surrender to them. She pointed out a rifle which they took and she handed Detective Rauff a piece of paper and said, "This is the note that Burr left me.” She identified other markings on the paper which had not been made by the deceased and turned over certain apparel belonging to Hollister.
The defendant’s psychologist, Dr. Elaine Dinitz, called her and suggested a meeting. The defendant had been consulting therapists for some years. Most recently she had been treated by Dr. Ifill, a psychiatrist. Dr. Ifill found the defendant to be agitated and to have trouble sleeping and prescribed the tranquilizer, valium.[1] The defendant had last seen Dr. Ifill on August 20, 1974. She met with Dr. Dinitz on October 2 and recounted the events of September 29 and 30. Dr. Dinitz found her narration coherent.
The pqlice wished to fingerprint the defendant. Although she consented with the advice of counsel when approached on October 3, the defendant indicated that she thought it unnecessary. Nevertheless, she went to police headquarters and was fingerprinted on October 4. Though apparently annoyed, the defendant seemed alert, responsive and co-operative.
Four days later the police executed a warrant authorizing the search of defendant’s residence for certain specified items. After consulting counsel the defendant advised the police that she would supervise the search and insure that they did not go beyond the scope of the warrant. She did in fact supervise the search and cautioned her children not to let the police look where they were not permitted to do so by the warrant. To officer Galasso who was present the defendant appeared to be more in control and composed than she had been on the 30th of September.
On October 10 the defendant reported that her home had been burglarized. She claimed that two address books had been taken and that feces had been left on her living room floor. Scientific analysis was unable to ascertain whether the waste was human or animal. (The defendant did have a pet dog.)
That same day the defendant met with Dr. Dinitz. In prior *342 testimony Dr, Dinitz stated that it was upon this occasion that the defendant brought with her a paper bag which she claimed contained feces. During the suppression hearing Dr. Dinitz testified that the bag incident occurred at the October 2 meeting. October 10 would seem the more likely date. In any event, the defendant told Dr. Dinitz that there was feces all over her living room; that "people” were following her at work carrying mops and cleaning the floor behind her and that physicians were examining the feces of her patients seeking bullets which she was suspected of having fed them. Dr. Dinitz testified that the defendant was then suffering from an acute schizophrenic episode, but the court does not adopt this conclusion.
The defendant wrote the following letter dated October 21:
"Dear Láveme & Letitia, Joretta
"Mommy has done a wrong thing, but yet it was the only thing to do. I took Burr life — I believe you all know that— maybe that is why you girls and other people acted in the way they did.
"I know you don’t understand this, but one day you will. The newspapers are going to be very nasty and tell lies on mommy — plus the friends I thought I had or we had will lie also. Hold your head high. Burr knew I was going to take his life and believe it or not — that is what he wanted — he was very depressed about something which I will never know about. He could have stopped me, because it was a small gun but his last words were quote "Go ahead and kill me — Maybe I should not have, listen, but I did. Pray for Mom & Burr — I do not believe it was another woman — I believe he used us for a personal experience and after he finished — he wanted to walk out but — I hope you are I always will be good and honest. I hope I will be able to see you all — I love you all and always remember I loved Burr to although I killed him.
"Love Always Mommy”
On October 22 the defendant confessed to the murder of Burr Hollister. First she went to the office of her new counsel, Robert Rivers. The defendant had dismissed the attorney obtained for her by Justice Harnett believing that the attorney, who had been a friend of the deceased, along with Justice Harnett and the then Democratic candidate for District Attorney belonged to the "establishment” and that the "estab *343 lishment” was not kindly disposed toward her. At Rivers’ office the defendant talked with and was observed by Mr. Corbin, an investigator. She was again smoking heavily and appeared agitated. She claimed that "people” were threatening her children and herself. She was concerned because her children were consistently being sent home from school due to illness although they would leave home feeling well. Of Burr Hollister’s murder the defendant said, "I must have done it.”
At approximately 5:40 p.m. the defendant, together with Attorney Rivers and Mr. Corbin, met with Chiefs Curran and Owens at police headquarters. Mr. Rivers informed the chiefs that the defendant had something she wished to say with regard to the murder of Burr Hollister. The defendant then said, "I killed Burr Hollister.” Attorney Rivers answered almost all the questions asked. The defendant expressed a desire to answer a question about her motives, but, after private consultation with counsel, she remained silent. During the questioning the defendant was under no physical restraint and seemed composed, alert and interested. After an Assistant District Attorney informed her of her rights under Miranda v Arizona (supra), she professed to understand the cautions. Basically the same questions were then repeated. Asked how she had killed Burr Hollister, the defendant responded and described how she had been sitting in a chair alongside the desk behind which the deceased sat; how she stood up, pointed the gun at his head and pulled the trigger; how the deceased turned, spread his arms and fell out of the chair onto his left side.
Officer Galasso had the opportunity to observe the defendant at police headquarters after her confession. She found the defendant to be comparatively nervous similar to her condition on September 30 and unlike her composed state on October 8. Still the defendant was in control. She did not cry and was able to talk and react while Officer Galasso obtained from her the information required for the arrest card. The defendant told Officer Galasso that she had makeup, cigarettes, curlers and a toothbrush in her pocketbook and wished to know what she would be able to retain in her detention cell. She also had occasion to answer questions asked of her by Desk Sergeant Busch relative to her physical condition.
The defendant was arraigned in District Court on the following day. As she was being escorted from the court she stated to reporters, "I have been framed. I killed Burr. I am *344 ready to talk.” As she entered the Sheriff’s car with Matron Ruth Gibson and Officer Michael Semoch, the defendant said, "They are trying to make me think I’m sick. I wouldn’t say any. more because if I say something more you will know.” Some months earlier Officer Semoch had given the defendant a traffic ticket for passing a stop sign. The defendant recognized him and said, "I did not pass the stop sign.” Indeed, she had been found not guilty. During her two hours with Gibson and Semoch the defendant conversed and seemed generally calm although she had been emotional and was crying when she spoke to the reporters.
Dr. Pechstein first examined the defendant on October 25, 25 days after the murder, four days after the letter, three days after the confession to police and two days after the statement to reporters. He again examined her on November 4, 1974. On both occasions he and his associate, Dr. Sutton, reported that the defendant was competent to stand trial. He found that the defendant had a good memory of facts which she was also able to discuss intelligently. She had a fair understanding of court proceedings and knew the plea options available to her. In general, Dr. Pechstein found that the defendant measured up to the standards for competency discussed in People v Valentino (78 Misc 2d 678, 684).
The defendant demanded a competency hearing (CPL 730.30, subd 3) and the hearing commenced in December. During the hearing the defendant’s mental condition deteriorated to the point where Dr. Pechstein found her incompetent to stand trial in January of 1975. Reevaluating his opinion in light of these subsequent facts, Dr. Pechstein then concluded that the defendant was suffering from the delusional belief that she and her children were in danger at the time of her various statements. Dr. Pechstein testified that these delusions interfered to some degree with the defendant’s appreciation of the nature and consequences of her statements. The court rejects Dr. Pechstein’s vivid description of the impact of these delusions in which he equated their effect with that of a physical beating. However, even were the court to accept that testimony, it would have to be evaluated in light of Dr. Pechstein’s further conclusion that the defendant understood the nature and consequences of what she said and rationally chose between the consequences of confessing and her delusional fears.
Dr. Schwartz, a psychiatrist, was called by the People. He *345 examined the defendant on January 21, 1975 and on May 2, 1975. He also reviewed the defendant’s letter dated October 21, 1974, her statement to Chiefs Curran and Owens, her statement to reporters and all the prior testimony in the hearing. Dr. Schwartz found the letter to be clear, logical and appropriate. It bore no evidence of psychosis nor did the confession to Chiefs Curran and Owens. Dr. Schwartz testified that had the confession been produced by delusional fears, then the defendant could not have restrained herself from blurting out on a number of occasions these delusional thoughts. Yet, the confessions show no evidence of such delusions. He also found the statement to reporters to be the product of a rational choice and free will. The court finds Dr. Schwartz’ testimony persuasive.
The defendant asks this court to exclude her various statements on the ground that they were not voluntarily made. (CPL 60.45, subd. 2). Such pressure or coercion as she alleges derived not from law enforcement officials or others, but from her subjective mental condition. There is no allegation that the police failed to conform to the requirements of law such as those set forth in Miranda v Arizona.[2] Rather the issue is whether by reason of a defendant’s mental condition a spontaneous confession may be involuntary and its admission in evidence a denial of due process.
Substantial evidence supports the conclusion that this defendant has psychological problems. Were this not true, there would have been no necessity for a hearing. But the presence of a mental disease or defect is only the threshold finding in an investigation of voluntariness. "The inquiry whether * * * a confession was voluntarily or involuntarily made involves, at the least, a three-phased process. First, there is the business of finding the crude historical facts, the external, "phenomenological” occurrences and events surrounding the confession. Second, because the concept of "voluntariness” is one which concerns a mental state, there is the imaginative recreation, largely inferential, of internal, "psychological” fact. *346 Third, there is the application to this psychological fact of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also, comprehend both induction from, and anticipation of, factual circumstances.” (Culombe v Connecticut, 367 US 568, 603). "Voluntary” describes the relative balance of competing values in a particular case and is inextricably joined to the circumstances from which it arises. (Schneckloth v Bustamonte, 412 US 218, 224-225.) The defendant’s mental state is but one such circumstance, albeit a central one. (People v Coffey, 42 Mich App 683; Commonwealth v Eisen, 358 Mass 740, revd sub nom Eisen v Picard, 452 F2d 860; Harvey v State of Mississippi, 207 So 2d 108 [Miss]; Green v United States, 389 F2d 949; State v Whittemore, 255 NC 583).
Once voluntariness was primarily a jury question and the prevailing rule was: "(I)n absence of total insanity, neither the voluntary character of a confession nor its admissibility is affected by the mental instability of the person making it. That condition is one for the consideration of the jury in determining the weight or effect to be given to the confession.” (McAffee v United States, 111 F2d 199, 204; cf. People v Schompert, 19 NY2d 300, 305; People v Joyce, 233 NY 61.)
When evolving notions of due process imposed an expanded role upon the judiciary, attempts to articulate a more precise standard resulted in extensive glosses upon the word "involuntary”. In Blackburn v Alabama (361 US 199, 207-208), the United States Supreme Court added such a gloss when it equated voluntariness with the decision of "a rational intellect and a free will.” There are differing views on the proper interpretation of this language.
At least three cases reflect a literal application of the "rational intellect and free will” language in Blackburn v Alabama (supra). Eisen v Picard (452 F2d 860, supra) involved a possibly deranged defendant who made several spontaneous confessions and admissions to friends and acquaintances with regard to the murders of his wife and daughter. The State court held that these statements were voluntary (Commonwealth v Eisen, 358 Mass 740, supra), but the Circuit Court remanded for a determination as to whether or not they were the product of a free will. In People v MacPherson (2 Cal 3d 109), the defendant’s mental state deteriorated as the result of a bizarre self-inflicted eye and brain injury which occurred while he was in custody. The court excluded inculpatory *347 statements spontaneously made while the injury was occurring and during its treatment holding that they were not the product of a "rational intellect and a free will.”[3] Insanity played no part in United States v Robinson (459 F2d 1164). There, during a colloquy with the court, the defendant, who sought time for consultation with counsel and for trial preparation, cited his guilt as one justification for extensive preparation. The Circuit Court of Appeals held that this statement was not a reasoned and deliberate act and could not be admitted. Dicta in other cases also supports the "rational intellect and free will” test of admissibility. (Gladden v Unsworth, 396 F2d 373; Pea v United States, 397 F2d 627; Matter of Cameron, 68 Cal 2d 487.)
Another body of cases holds that a confession is involuntary in the due process sense only where there has been external pressure or coercion. They hold that, Blackburn v Alabama (supra) notwithstanding, a spontaneous confession cannot be excluded as involuntary. Two such cases involve intoxicated defendants. In United States v Bernett (495 F2d 943), the defendant had been drinking all day before he spontaneously confessed to police upon being asked to identify himself. In Britt v Commonwealth (512 SW2d 496 [Ky]), the defendant had a blood alcohol content of .22% when he confessed in response to custodial interrogation. The Bernett court held that a noncustodial confession could not be involuntary absent external coercion, while the Britt court interpreted the "rational intellect and free will” language in Blackburn as meaning merely that where a defendant’s will to resist has been overborne by external pressure his confession cannot be used against him. (Accord, People v Wolfram, 12 Ill App 3d 262 [drug ingestion]). The defendant in Commonwealth v Masskow (290 NE2d 154 [Mass]) was apparently neither drunk nor drugged when he spontaneously confessed to the killing of his brother-in-law. He was mentally ill. Without conceding the correctness of Risen v Picard (452 F2d 860, supra), the Supreme Judicial Court of Massachusetts construed it as distinguishing between spontaneous custodial confessions to police and spontaneous noncustodial confessions to civilians. The former might be so inherently suspect as to require a prophylactic rule, but the latter are admissible unless there is a strong probability that the confession was the product of an *348 insane compulsion rather than intelligent recollection. Ability to recall, along with the abilities to perceive and relate, make up testimonial competence. (2 Wigmore, Evidence [3d ed], §§ 493-495.) Those cases which reject the possibility of involuntariness absent external coercion or pressure, treat testimonial competency at the time of the confession as constituting competency to confess.[4] (United States v Bernett, supra; Britt v Commonwealth, supra; People v Wolfram, supra; Commonwealth v Masskow, supra; cf. People v Coffey, 42 Mich App 683, supra.)
Fairness is the pivot upon which voluntariness turns for those who advocate a literal application of Blackburn’s "rational intellect and free will” language. Usually the climax of their argument is a further quotation from Blackburn: "Surely in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane; and this judgment can without difficulty be articulated in terms of the unreliability of the confession, the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion.” (Blackburn v Alabama, 361 US 199, 207, supra.) The appeal which this statement has for those who read it out of context dissolves under scrutiny. After all, one is not punished for conduct produced by mental disease or defect (Penal Law, § 30.05), not tried while incompetent (CPL 730.10, subd 1; CPL 730.30) and not convicted upon an uncorroborated confession (CPL 60.50). Perhaps, an accusatory system of justice should strive toward suppression of all confessions as an ideal (Malloy v Hogan, 378 US l),[5] but the Supreme Court has held that countervailing *349 interests support the use of confessions both reliable and uncoerced. (Schneckloth v Bustamonte, 412 US 218, supra). Unlike confessions which occur after nine hours of custodial interrogation (Blackburn v Alabama, supra) or custodial confessions by defendants susceptible to suggestion (People v MacPherson, 2 Cal 3d 109, supra; Matter of Cameron, 68 Cal 2d 487, supra), the use of spontaneous noncustodial confessions does not violate the traditional notions of fairness summarized in the guarantee of due process of law. "Admission of this statement is no more prejudicial to [the defendant’s] right to remain silent at trial than would be the introduction of a revolver with his name stamped on it which he had left at the scene. Perhaps more importantly, exclusion of such statements would destroy the usefulness of the criminal’s guilty and indiscreet candor in the process of law enforcement. Of course such candor should not be coerced; but if it is offered up before the conscientious policeman can even reach for his Miranda warning form-card, the law cannot and should not look the other way.” (United States v Bernett, 495 F2d 943, 971, supra.) The defendant was and is not being compelled to be a witness against herself (U.S. Const., 5th Arndt.; Michigan v Tucker, 417 US 433, 440; Levy, The Origins of the Fifth Amendment) and the law enforcement officials have obeyed the law while seeking to enforce it (Spano v New York, 360 US 315, 320-321; Michigan v Tucker, supra, p 447).
"Rational intellect and free will” as a test literally applied, is a far too metaphysical concept for a court of law. "Whatever may be one’s individual notion of "free will”, all must concede that it is severely limited (if not entirely circumscribed) by all that has gone before. Each is the prisoner of his own life. What he wills to do depends on what he is, and that may at any given time represent an amalgam of drunkenness, stupidity, lust, greed, honesty, dishonesty, fear, loyalty, indi *350 gestión and an infinite variety of other hereditary and environmental forces which not only restrict his freedom of choice but, in the last analysis, are the threads and materials of which it is sewn.” (Britt v Commonwealth, 512 SW2d 496, 500 [Ky], supra.) "Whether a man may speak out at a given time, and what he may say, reflect the tension of manifold forces within him, some moving him to speak, others to refrain from speaking. The number and quality of these forces are as complex as the emotions, ego and conscience of man.” (Pea v United States, 397 F2d 627, 634, supra.)
So speculative is the nature of free will that the more articulate advocates retreat to "self-protective mechanism” as its definition. (Pea v United States, supra, p 634; United States v Bernett, supra, p 953). They would require a finding that the defendant comprehended the damning nature of what he said and had the power to resist saying it before a confession would be admitted. (People v MacPherson, 2 Cal 3d 109, 114-115, supra.) This criterion resembles one of the components of capacity to stand trial; namely, an appreciation that one course of action may be more beneficial (or harmful) than another. (People v Valentino, 78 Misc 2d 678, 684, supra.)
As with other mental faculties the presence of intellect or volition are questions of degree. Just as the ability to assist counsel with a "modicum of intelligence” is sufficient for capacity to stand trial (People v Francabandera, 33 NY2d 429, 435-436), so too the presence of minimal intelligence and free will should suffice for a finding of competency to confess. Complex moral beliefs and ethical standards may combine with emotional factors to prompt a confession. (Consider, Andrews v Hand, 190 Kan 109 [defendant who murdered his parents and sister confesses to his minister and then to police]; Gessner v United States, 354 F2d 726 [after conversation with his chaplain the defendant admits having divulged secret information]; United States ex rel. Cronan v Mancusi, 444 F2d 51 [defendant who shot his wife confesses in the presence of his mother-in-law]; Dannelly v State, 4U Ala App 363 [defendant who shot his father confesses to his uncle]). Whether such complex motivations should be considered coercive either alone or in combination with mental illness may entail value judgments inappropriate for a court to make. A requirement that the decision to confess be made with a "modicum” of intelligence (cf. People v Francabandera, supra) *351 would appear to be an ample guarantee of voluntariness absent any hint of external coercion.
Apparently no New York court has considered the voluntariness of a spontaneous or volunteered confession by a mentally ill defendant. The comparable effects of voluntary intoxication, drug ingestion, and trance-like states have been considered, however. The leading New York case is People v Schompert (19 NY2d 300, supra). There an intoxicated defendant with a history of psychosis confessed to a burglary during custodial interrogation. The Court of Appeals held that in the context of voluntary intoxication and absent coercive official conduct, the criterion for admissibility of a confession is trustworthiness. In People v Adams (26 NY2d 129), the Court of Appeals applied the same rule to voluntary drug ingestion distinguishing Townsend v Sain (372 US 293) where the drugs had been administered under the supervision of law enforcement agents.[6] People v Baldi (80 Misc 2d 118), though involving interrogation, approaches the instant case. There a confession made to a police officer by an unstable individual during a self-induced trance-like state was admitted upon a determination that it was trustworthy.
The use of trustworthiness as a standard in New York should be distinguished from the use of trustworthiness as a standard for voluntariness, a rule condemned in Rogers v Richmond (365 US 534). First the court must find a confession voluntary in that no external pressure or coercion was used; only then will it consider trustworthiness as a test for admissibility. "With respect to coercion, the reliability or trustworthiness of an inculpatory statement is irrelevant. Lego v Twommey, 404 US 477, 485. With respect to volitional competence, or mental capacity, it is vital.” (Britt v Commonwealth, 512 SW2d 496, 499, supra.)
Patently unreliable evidence is inadmissible. As the testimonial competency of a witness is a threshold inquiry into the trustworthiness of his testimony, the testimonial competency of a defendant at the time of his confession is a threshold inquiry into the trustworthiness of the statement. Here again one of the components of capacity to stand trial is recalled: namely, ability to perceive, recall and relate at the time of trial so as to be able to assist counsel or defend pro se. (See *352 People v Valentino, 78 Misc 2d 678, 684, supra.) A more objective measure of the trustworthiness of the statement is the content of the statement itself. (People v Schompert, supra, p 307.)
The statements which the defendant seeks to suppress were made voluntarily in the due process sense. Law enforcement agents used no improper pressure or coercion. With rare exceptions the defendant was composed and in control when making the statements attacked. (See United States ex rel. Cronan v Mancusi, 444 F2d 51, supra; State v Coffey, 42 Mich App 683, supra). Her occasional nervousness was not significant under the circumstances. The defendant understood the nature and effect of her statements and intelligently chose to make them. She could have effectively resisted making the statements if she had so desired. An individual might well recount irrational thoughts to his psychologist and yet not guide his conduct by them. The relationship between psychologist and patient is such as to encourage the revelation. The court finds that such delusional thoughts as the defendant may have had were not a significant factor in prompting her statements. The defendant’s obvious understanding of and obedience to the advice of counsel combined with the nearly contemporaneous psychiatric findings of competency to stand trial constitute competency to confess. (Cf. People v Reason, 37 NY2d 351; Cox v State, 240 Ark 911; Barnes v State, 258 Ark —, 18 CrL 2185.) Certainly the defendant’s "self-protective mechanism” was functioning.
Specifically, the court holds that the defendant’s statements are trustworthy and that she possessed testimonial competency when she made them (People v Schompert, supra). There is no evidence that the defendant’s abilities to perceive, recall and relate were impaired. She was alert and responsive. Her conversation and statements were logical and coherent as was her letter to her children. Her description of the murder was sufficiently detailed to indicate an origin in memory. Unlike People v MacPherson (2 Cal 3d 109, supra) and Matter of Cameron (68 Cal 2d 487, supra) there is no evidence that the defendant was susceptible to suggestion.
The defendant’s comments to the media following her arraignment pose a special problem. The defendant relies upon People v Meyer (11 NY2d 162, 164-165, where the Court of Appeals held that: "any statement made by an accused after arraignment not in the presence of counsel * * * is inadmissi *353 ble.” The defendant argues that Meyer requires the suppression of her postarraignment statements.
In the Appellate Division report of Meyer, which the Court of Appeals affirmed, the court stated the facts as follows: "At one stage of the trial the arresting detective testified to a discussion he had with defendant in an effort to persuade him to admit his guilt and identify the girl who had allegedly accompanied him to the site of the robbery. Defendant never did admit his guilt outright nor did he identify any girl as his accomplice. According to the detective, however, in the course of the questioning defendant virtually confessed his guilt by the tenor of his counterproposals. For example, at one point he said: "Just assuming I did this though, I want to know what’s going to happen?”
"The Assistant District Attorney evidently believed, as did the trial court, that admissions made by a defendant under questioning in the absence of counsel are barred only when procured after indictment.” (People v Meyer, 14 AD2d 241, 242.) (Emphasis supplied.)
The Court of Appeals in Meyer, relying primarily on Spano v New York, (360 US 315, supra) speaks of (p 164) "a statement obtained from an accused” (Emphasis supplied). The Court of Appeals therefore recognized that the statement (though "voluntary”, "uncoerced” and "unsolicited”) was obtained during the course of interdicted postarraignment interrogation. In this connection, the court’s reliance on Spano is significant. In Spano, the Supreme Court held (pp 323-324): "We conclude that petitioner's will was overborne by official pressure, fatigue and sympathy falsely aroused, after considering all the facts in their post-indictment setting. Here a grand jury had already found sufficient cause to require petitioner to face trial on a charge of first-degree murder, and the police had an eyewitness to the shooting. The police were not therefore merely trying to solve a crime, or even to absolve a suspect * * * They were rather concerned primarily with securing a statement from defendant on which they could convict him. The undeviating intent of the officers to extract a confession from petitioner is therefore patent.” (Emphasis supplied).
As the People so cogently argue, "It is the interrogation, in the absence of counsel, after the criminal proceeding has been commenced”, which Meyer forbids. (People v Rodriguez, 11 NY2d 279, 284). "Any statement given freely and voluntarily *354 without any compelling influences is, of course, admissible in evidence.” (Miranda v Arizona, 384 US 436, 478, supra). "Absent interrogation, post-Miranda decisions have consistently held that volunteered or spontaneous statements made by suspects who were plainly in custody * * * are admissible.” (People v Kaye, 25 NY2d 139, 144; see, also, People v Gunner, 15 NY2d 226.) Even an incarcerated defendant is capable of making voluntary inculpatory statements provided they are not prompted by interrogation or coercion. (People v Graydon, 69 Misc 2d 574; Stroud v United States, 251 US 15.) Inasmuch as the statements here at issue were either not made to the police or not in response to interrogation;, Meyer does not require their suppression. Indeed, since it is postarraignment interrogation which Meyer seeks to prohibit, even the spontaneous statements made to Matron Gibson and Officer Semoch are not suppressible under Meyer.
The motion to suppress is in all respects denied.

. See, State v Alvis (70 Wash 2d 969, 973); Ann. 69 ALK2d 384.

. (384 US 436, 477-478). "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding * * * Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence * * * There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime”. See, also, People v Yukl (25 NY2d 585, 589). For a confession made in the presence of counsel see, Government of Virgin Islands v Ruiz (354 F Supp 245) and Miranda v Arizona, supra 470).

. Another confession made to the attorney and investigator for a relative charged with the crime, to which the defendant confessed, was admitted.

. There is a third position represented by at least two cases which indicate that if an individual can distinguish right from wrong, then he is competent to confess. (Jarrett v State, 500 P2d 1027 [Wyo]; Andrews v Hand, 190 Kan 109; contra, State v Aviles, 45 NJ 152). Andrews v Hand (supra) also states that absent coercive, oppressive or fraudulent police tactics there is no basis for suppression.

. Of interest are the origins of the right against self incrimination in Talmudic law. In Talmudic law, self incriminatory testimony, whether voluntary or compulsory, was forbidden.
For a comprehensive discussion of the rule, see Levy, Origins of the Fifth Amendment, Appendix, Talmudic Law, p 433, et seq., particularly p 438. "The great Maimonides, who codified the Talmud in the late Twelfth Century, made the following explanation: 'It is a scriptural decree that the court shall not put a man to death or flog him on his own admission [of guilt]. This is done only on the evidence of two witnesses * * * The Sanhedrin, however, is not empowered to inflict the penalty of
*349 death or of flagellation on the admission of the accused. For it is possible that he was confused in mind when he made the confession. Perhaps he was one of those who are in misery, bitter in soul, who long for death, thrust the sword into their bellies or cast themselves down from the roofs. Perhaps this was the reason that prompted him to confess to a crime he had not committed, in order that he might be put to death. To sum up the matter, the principle that no man is to be declared guilty on his own admission is a divine decree.’ ” (Emphasis supplied). See, also, Miranda v Arizona (supra, p 458, n 27); Privilege Against Self-Incrimination in Anglo-American and Jewish Law, 5 Am J Comp L 115; Privilege Against Self-Incrimination, 51 J Grim L C & P S 131, 175 (note that at p 178 it is stated that the rule in modern day Israel is not unlike that in the United States); Garrity v State of New Jersey (385 US 493, 497, n 5).

. (See People v Adams, 26 NY2d 129, 137 [dicta]: "The same criteria are applicable to admissions made by a defendant suffering from a mental disease.”)