**H. C. BRITT, Jr., Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

May 17, 1974.

Rehearing Denied Sept. 13, 1974.

A. M. Wilhoit, Public Defender, William C. Ayer, Jr., Asst. Public Defender, Frankfort, for appellant.

Ed W. Hancock, Atty. Gen., Carl Miller, Asst. Atty. Gen., Frankfort, for appellee.

PALMORE, Justice.

On the afternoon of December 18, 1972, an automobile occupied by Kenneth Aring-

ton and the appellant, H. C. Britt, Jr., struck and fatally injured a small boy on a street near the outskirts of Mayfield, Kentucky. The car did not stop, but from a description and partial license-plate number furnished by a witness the police were able within the next three hours to identify it as belonging to Arington, whom they arrested at his home in Mayfield between 6:00 and 6:30 of the same evening. The time of the accident was about 3:30 P.M.

When apprehended, Arington began to cry and admitted that his car had struck the child. He related the details of the accident, reported that Britt had been the driver, and said that he had tried unsuccessfully to get Britt to stop.

Meanwhile, at 4:15 P.M. Captain James Elder of the police department happened to observe Britt at 12th and Broadway in Mayfield, "and he was falling all over the street and I arrested him for public drunk at that time." However, it was not until Arington was arrested and brought to the police station some two hours later that Britt's involvement in the fatal accident was discovered by the police. Britt was then brought up from the jail, given the Miranda warnings, and questioned. He admitted that he had been the driver of the car and submitted to a breathalizer test, which registered his blood-alcohol content at .22%.[1] According to Captain Elder's testimony, this test was given at 6:24 P.M.,[2] more than two hours after Britt had been taken to jail. He described Britt as having been "very drunk . . . almost passed out" when arrested, but neither drunk nor sober at the time of the interview in which he admitted having been the driver of the car. Another officer described his condition at the latter time as "fairly drunk" and expressed the opinion

that he "just didn't know really where he was at or what he was doing. He just seemed in a state of coma of some kind."[3]

In due course Britt was indicted for involuntary manslaughter in the first degree, KRS 435.022(1), and leaving the scene of an accident, KRS 189.580, was found guilty of both, and was given a sentence of 10 years' imprisonment on the manslaughter conviction and a $500 fine and jail sentence of one year on the hit-and-run count. He appeals, claiming error in the trial court's denial of his motions for a change of venue and for suppression of the alleged confession and in admitting evidence of a prior conviction for driving while under the influence of intoxicating liquors.

Conceding that there had been unfavorable pretrial publicity through the local news media, we are satisfied from reading the *voir dire* that the jurors who had been thus informed of the incident and who were permitted to remain on the panel were free of prejudice against Britt and that there was no necessity for a change of venue. Cf. Peters v. Commonwealth, Ky., 505 S.W.2d 764, 765 (1974).

That Britt had been convicted of driving under the influence of intoxicating liquors was elicited on cross-examination in response to a question (improper, of course) as to why he had no driver's license. However, there was no objection to the question, nor a motion to admonish the jury, hence there is no basis for a finding of error. We believe, moreover, that under the circumstances of the case the disclosure is not likely to have been prejudicial. Britt had volunteered the information that he did not have a license, and he introduced expert testimony to the effect that he was a confirmed alcoholic. An in-

---

1. For purposes of the "drunk-driving" statute, .10% gives rise to a presumption that the driver was "under the influence of intoxicating beverages." KRS 189.520 (4) (c).

2. There is some discrepancy in the testimony concerning exact times, but it is not of vital importance.

3. This testimony was given in the course of the trial, but not during the pretrial hearing on the motion to suppress.

telligent juror could scarcely have failed to infer the connection anyway.

The most serious question presented is whether the inculpatory information divulged by Britt while in police custody and with his faculties impaired by self-induced intoxication should have been suppressed.

■■ The procedure to be followed when the voluntariness of a confession is challenged was laid out in Bradley v. Commonwealth, Ky., 439 S.W.2d 61 (1969). On a motion to suppress, the trial court must conduct an evidentiary hearing in chambers. Only if he is satisfied from substantial evidence that the confession was voluntary (and is not otherwise inadmissible) can it then be heard and considered by the jury. Constitutionally, this is all that is required, and if the trial court's determination is supported by substantial evidence it would be conclusive, cf. Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L. Ed.2d 618 (1972), but for the additional protection prescribed in *Bradley* to the effect that if the defendant chooses to carry the question to the jury he may do so with the benefit of an admonition that the evidence shall not be considered unless the jury believes that the confession was made voluntarily and free of coercion. 439 S. W.2d at p. 64.

In the instant proceeding the trial court held an extensive in-chambers hearing on the motion to suppress, but the defendant did not thereafter request an admonition to the jury. In this procedural posture, the precise question is whether as a matter of law, under the evidence produced at the hearing on the motion to suppress, the confession should have been excluded.

We may say without fear of contradiction that the evidence of Britt's having been given the Miranda warnings was sufficient. The heart of the problem is whether his waiver and ensuing admissions

were, from a legal standpoint, "voluntary." In resolving that problem it is necessary to identify the relationship between "volition" and intoxication, recognizing meanwhile that there certainly can be and have been hybrid-type situations in which a state of intoxication is one of the circumstances to be considered in determining whether an in-custody confession was coerced.

■■ With respect to coercion, the reliability or trustworthiness of an inculpatory statement is irrelevant. Lego v. Twomey, 404 U.S. 477, 485, 92 S.Ct. 619, 30 L. Ed.2d 618 (1972). With respect to volitional competence, or mental capacity, it is vital. People v. Schompert, 19 N.Y.2d 296, 279 N.Y.S.2d 515, 226 N.E.2d 305, 307 (1967). There, the question is simply whether the man's condition indicates a substantial likelihood that he may not have been telling the truth.

■ The traditional rule has been that a confession otherwise voluntary is not to be excluded by reason of self-induced intoxication unless "the accused was intoxicated to the degree of mania, or of being unable to understand the meaning of his statements." Peters v. Commonwealth, Ky., 403 S.W.2d 686, 688 (1966), quoting from Annotation, Intoxication of accused at time of confession as affecting its admissibility, 69 ALR2d 361, 362 (1960). See also 3 Wigmore, Evidence § 841 (Chadbourne rev. 1970).

It has been observed that in recent years courts may have been oversensitive to drunken confessions. Marshall and Reiter, The Confessions of a Drunk, 59 ABA 497, 499 (1973). See, for example, Logner v. North Carolina, 260 F.Supp. 970 (M.D.N. C.1966). Other good discussions may be found in State v. Cuzzetto, 76 Wash.2d 378, 457 P.2d 204 (1969), and State v. Scandrett, 24 Utah 2d 202, 468 P.2d 639 (1970), in the latter of which a blood-alcohol content of .26% was not deemed suf-

fient to require exclusion of the statements.[4]

In Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960), cf. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the United States Supreme Court used the expression that a confession must be "the product of a rational intellect and a free will"—free, that is, in the sense that it was not "overborne." Whatever may be one's individual notion of "free will," all must concede that it is severely limited (if not entirely circumscribed) by all that has gone before. Each is the prisoner of his own life. What he wills to do depends on what he is, and that may at any given time represent an amalgam of drunkenness, stupidity, lust, greed, honesty, dishonesty, fear, loyalty, indigestion and an infinite variety of other hereditary and environmental forces which not only restrict his freedom of choice but, in the last analysis, are the threads and materials of which it is sewn. The search for a definition of "free" volition is indeed a long day's journey into nowhere.

▉ Aside, then, from the possibility of unconstitutional coercion from other people, ordinarily the police, we are disposed to believe that "voluntariness" is too elusive a concept to be a satisfactory criterion for the confession of a drunk, and we think that the very use of such an expression as "rational intellect and free will" connotes that except for coercion the freedom of will actually is measured by rationality of intellect. In short, the basic question is whether the confessor was in sufficient possession of his faculties to give a reliable statement, the burden being on the prosecution to show that he was.

▉ It is only when intoxication reaches the state in which one has hallucinations or "begins to confabulate to com-pensate for his loss of memory for recent events"[5] that the truth of what he says becomes strongly suspect. Loss of inhibitions and muscular coordination, impaired judgment, and subsequent amnesia do not necessarily (if at all) indicate that an intoxicated person did not know what he was saying when he said it. "In vino veritas" is an expression that did not originate in fancy. If we accept the confessions of the stupid, there is no good reason not to accept those of the drunk.

At the pretrial suppression hearing in this case there was no evidence to suggest that when he waived his Miranda rights and admitted having been the driver of the car Britt did not understand what he was doing or may have said things that were not so. According to the local sheriff, "Elder read him his rights and actually he didn't question him. He told him that the owner of the car had told us what had happened and he wanted to hear it from him and he readily admitted it and was very concerned over the kid and broke down and started crying." Captain Elder testified that he was "capable of giving a good report . . . was in very good shape. He wasn't too drunk to stand."

Britt did not testify at the suppression hearing but did appear as a witness in his own behalf during the course of the trial. He admitted that when he and Arington were about to leave from Water Valley toward Mayfield he asked if he could drive the car and said he knew some back roads, and that Arington agreed. By his own account, "The last thing I remember I was driving the car." He remembered having a fight with Arington shortly after the fatal accident. He remembered getting into the police car when he was arrested, and he "vaguely" remembered taking the breathalizer test. The main things he did not remember were the accident itself and

---

4. That Scandrett had identified himelf as the culprit before being taken into custody (as had Cuzzetto), though it might have had a bearing on the question of coercion, would of course have nothing to do with the isolated question of volitional competence.

5. Marshall and Steiner, The Confessions of a Drunk, 59 ABAJ 497 (1973).

what he had told the police. A psychologist testified that he is a confirmed alcoholic and has memory gaps, but was not asked and did not say what effect this condition might have had upon his intellectual rationality or volitional "freedom" at the time of the confession.

We have no difficulty in concluding that the trial court did not err in admitting the inculpatory statement. Without any evidence of the extent, if any, to which Britt's intoxication impaired his capacity to understand and tell the truth, and without any evidence of coercion other than the simple fact that he was drunk and in police custody and had been advised that Arington had told the police what had happened, we think that the court had no alternative. We are not at all persuaded that it would make sound law to hold that the combination of intoxication and police custody must add up to a violation of due process.

The judgment is affirmed.

All concur.