**Larry Joseph BROWN, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Supreme Court of Kentucky.

Nov. 18, 1977.

Kevin M. McNally, Asst. Public Defender, Frankfort, for appellant.

Robert F. Stephens, Atty. Gen., Mark F. Armstrong, Asst. Atty. Gen., Frankfort, for appellee.

JONES, Justice.

On July 19, 1976, Larry Joseph Brown, alias Nathaniel Hardin, was indicted on three counts: first degree robbery (KRS 515.020); murder (KRS 507.020); and theft by unlawful taking (KRS 514.030). At a pre-trial conference by agreement of counsel, the indictment was amended to read: "Nathaniel Hardin alias Larry Joseph Brown."

The jury found Brown guilty on all counts. It fixed his punishment at 20 years on the robbery conviction, life on the murder conviction, and 5 years on the theft conviction.

Brown asserts three grounds for reversal of the convictions: (1) error resulted when a police officer referred to him by his nickname, "Killer"; (2) the trial court allowed into evidence an involuntary confession; and (3) photographs of the deceased were allowed into evidence over the objection of his attorney.

Chester Coleman Parke was a route salesman for the Paul Myers Company. On June 3, 1976, he called on Daley's Market on West 4th and Schmidt Streets in Lexington, Kentucky. The owner, Robert Lee Williams, showed Mr. Parke a .22 caliber pistol which he kept in the store. Five or ten minutes after Parke arrived at Daley's Market, two black men entered the store. One

of them asked for a candy bar. When Williams went to the cash register, one of the men pulled a pistol on Williams. Williams attempted to defend himself with his pistol. However, one of the robbers shot and killed Williams.

Johnny Christopher Jones, a co-indictee, testified that on the morning of the murder Brown came to his house. Brown wanted Jones to accompany him in a planned robbery. At that time, Brown had a .38 caliber pistol. Jones and Brown went to Daley's Market. Jones testified that Williams began the shooting. Jones then fled the store and Brown fled shortly afterwards. Jones testified that Brown told him he had shot the man in the store.

Jones also admitted to participation in a theft from an automobile, where he took the sum of $300 or $400. He further testified he gave the money to Brown. When he and Brown were arrested, Brown had the money on his person.

Clyde Norton, manager of the J. T. Barrick Hardware, had $314.27 in the glove compartment of his automobile. When he returned from lunch he found his car had been broken into and the money taken. When Brown was arrested on June 4, 1976, a police officer removed from Brown an envelope containing $300, which was marked "J. T. Barrick Hardware." Norton identified the envelope as containing the money taken from his car.

Other evidence was that a Lexington police officer obtained a finger print that was identical to Brown's. A .38 metal slug was retrieved from the scene of the crime. A Harrison-Gilroy test on Brown was conducted by a Kentucky State Police laboratory technician. The technician testified that the test, which is used to determine whether any residue from the firing of a pistol is present on the person, showed a positive reaction from the swab taken from the palm of Brown's right hand.

On June 4, 1976, Larry Brown made a voluntary statement to Detective Kirby Allen, a Lexington Metropolitan police officer.

In that statement, Brown, after being advised of his constitutional rights,[1] stated:

"DATE <u>4 June 1976</u> PLACE <u>1409 Forbes Rd. Lexington, Ky.</u> TIME STARTED <u>1825 hrs.</u>

I, the Undersigned, <u>Larry Brown</u>, am <u>28</u> years of age, have been born on <u>July 5, 1947</u> at <u>Atlanta, Georgia</u>. I now live at <u>191 Northeastern, Lex. Ky.</u> I have been duly warned and advised by <u>Det. Kirby Allen</u>, a Lexington Metropolitan Police Officer, that I am charged with <u>Robbery and Murder</u>; that I do not have to make any statement or answer any questions, and any statement I do make or question I do answer will be used against me at any later hearing or trial; that I have a right to an attorney and that if I cannot afford an attorney, one will be appointed me free of charge, at this time; and that I have a right to stop the interview at any time I wish.

I do not want to talk to a lawyer, and I hereby knowingly and purposely waive my right to the advice and presence of a lawyer before and during any questioning or at any time before or while I voluntarily make the following statement to the aforesaid person, knowing that anything I say can and will be used against me in a court or courts of law.

I declare that the following voluntary statement is made to the aforesaid person of my own free will without promise of hope or reward, without fear or threat or physical harm, without coercion, favor or offer of favor, without leniency or offer of leniency, by any person or persons whomsoever.

       X  Larry Brown  
       Signature of person giving voluntary statement

Q. #1—What happened yesterday at Daley's Market?

A. #1—He pulled a gun and fired at me, I shot at him as I ran out the door.

Q. #2—Did you go into the store to hold the man up?

A. #2—Not at first.

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Q. #3—What do you mean not at first?

A. #3—I went in to buy a candy bar.

Q. #4—When did you start to think of robbing the man?

A. #4—On the spur of the moment.

Q. #5—Where did you carry your gun?

A. #5—In my belt. I didn't pull it out at first. I just showed it to him and he started shooting at me.

Q. #6—Who was with you?

A. #6—Johnny Jones.

Q. #7—Can you add or remember anything else?

A. #7—That's it.

End of Statement.

Witnessed By: Robert Giles

Transcribed By: Kirby Allen #4455

Time Completed: ___1840 hrs.___

        X  Larry Brown___

        Signature"

Brown had made a previous statement in which he denied any knowledge of the robbery or theft. Brown did not take the witness stand and made no defense against the evidence presented against him.

This court now turns to the issues Brown raises in support of his argument for reversal. Prior to the trial, Brown's attorney requested that the Commonwealth's Attorney refrain from expressing to the jury Brown's nickname, "Killer." The colloquy between the court, the Commonwealth's Attorney, and Brown's counsel, at the pretrial conference concerning this question, is as follows:

"MR. BARBIERI: I would like for the defendant to be referred to throughout this proceeding as Nathaniel Hardin or Larry Brown, but not any other name. Any other name, he doesn't use.

THE COURT: I think you might as well be specific as to what you do not want the Commonwealth to refer to.

MR. BARBIERI: I do not want the Commonwealth to refer to my client as *'Killer' either before or after his name.*

MR. FAMULARO: It would be the position of the Commonwealth that, if, in fact, this is a name he has used and has gone by, and it may be a name under which people know him by and that name alone, and to prohibit them from saying that, that would be to detract from their identity and knowledge of him.

THE COURT: I think it can be handled, Mr. Famularo, without getting into it by saying, 'Do you know this person though you may know him by another name?' I think it is fair to let the witness say he knows him and knows him by name though that name may not be Nathaniel Hardin or Larry Brown, if that happens to be the case. I think you can handle it that way. *If, in fact, it is not elicited by you —*

MR. FAMULARO: *I won't do that* if the Court tells me not to, but I worry about—

THE COURT: I think you should try to phrase your questions in such a way as to try to avoid it. If that is, in fact, a nickname, Mr. Barbieri, that is not the Commonwealth's fault. Do you understand that, Mr. Barbieri?

MR. BARBIERI: Yes, Your Honor, I understand that, but, at the same time, I don't want him to solicit that name.

THE COURT: To that extent, I will direct that the Commonwealth will not intentionally try to elicit that; in fact, they should try to avoid that if possible and not to make reference to that during the course of the trial. Any thing else?" (Emphasis added).

Despite the trial court's ruling, Detective Giles a police veteran of 13 years, testified that he was called upon to assist in the investigation of Larry Brown on June 3, 1976. After receiving information about the murder he was asked:

"Q. Did you then make an attempt to locate the whereabouts of Larry Brown alias Nathaniel Hardin?

A. I attempted that the following day.

Q. Where was the defendant located and when?

A. The following day after receiving the nickname as a suspect, Larry Brown, alias *'Killer.'* "

Brown's counsel immediately moved for a mistrial on the ground that Officer Giles

referred to Brown as "Killer" in open court before the jury. He contended this statement irreparably harmed Brown and caused such prejudice so as to prevent him from obtaining a fair trial. The court overruled the motion, but gave a strong admonition. The incident is unfortunate. This court notes, however, that there was no deliberate attempt by the prosecutor to elicit the nickname. Therefore the trial court's order was not violated. It clearly directed the prosecutor not to deliberately elicit the nickname.

Brown cites a number of cases in support of his position that this was so prejudicial as to affect his substantial rights and that a mistrial should have been declared. It is true that this court has often denounced placing labels on the accused, but the cases cited by Brown are distinguishable from the facts in this case. Cf. *Spirko v. Commonwealth*, Ky., 480 S.W.2d 169 (1972). This court is not convinced by Brown's argument that the nickname indicates such a history of violence that it is prejudicial in a defense against a charge of murder. The admonition by the trial court follows:

"THE COURT: (To Jury) Ladies and Gentlemen of the Jury, something has just happened that shouldn't have happened. The police officer volunteered something that he shouldn't have volunteered. It has nothing to do with the trial of this case, somebody's possible nickname. We have all watched Flip Wilson and we know that Geraldine has a boyfriend by the name of 'Killer.' It means nothing to this case; it has nothing whatsoever to do with this case whether somebody at some point in time had a nickname. I think you jurors have enough common sense not to let this occurrence spoil a trial. We have been here all day, and I know you have enough common sense to know that that doesn't have anything to do with this trial of this case or as to the question of the guilt or innocence of Mr. Hardin. So, you have heard it and I can't go in there an erase what you have heard, but I am going to allow your good common sense to know that it has nothing to do with the trial of

this case and I know you won't attached any significance to it; it just shouldn't have come in and I think that is known."

This court is of the view that Brown's nickname, "Killer" is not such as to indicate a violent character or that he killed in the past. The trial court pointed out that the name "Killer" is given to a character created by the comedian, Flip Wilson. Flip plays the part of Geraldine whose boyfriend is "Killer," noted for his romantic endeavors and not his violence. On October 25, 1977, a sports writer referred to the Kentucky football team as follows: "Curci's Killers Thrive on Strength, Speed." On November 1, 1977, another sports writer for the Courier Journal stated: "Lee Corso, still glowing following Indiana's big victory over *Michigan-Killer Minnesota*, said . . . we're having a great year." Those terms were used to show the competitive spirit of the Kentucky Wildcats and the Indiana Hoosiers.

■ Admittedly, it would have been better if the veteran detective had not mentioned Brown's alias as "Killer." However, it is difficult for this court to see how a jury could be prejudiced in this case, especially in light of the trial court's strong admonition to the jury. This court is of the view that under the totality of the evidence and Brown's confession; coupled with the trial court's admonition, the irregularity was not prejudicial to Brown's substantial rights.

■ Brown's next claim of error concerns the admission of evidence. He argues that the trial court committed reversible error and denied his right against compulsory incrimination by permitting introduction of a confession when he was ill from heroin withdrawal. On August 17, 1976, Brown moved to suppress his pretrial confession. After a full evidentiary hearing, the trial court made extensive findings of fact and denied the motion. The trial court found that Brown's confession was free and voluntary and that he was not suffering symptoms of drug withdrawal. The question presented here is whether the factual deter-

mination of the trial court and its ruling was erroneous. This court is of the view that it was not. The trial court also found that there was no evidence, other than that of Brown, that he was a heroin addict. The trial court found also that Brown was advised of all his constitutional rights and that he voluntarily talked with the police and understood he had a right to remain silent. This court has established guidelines for trial courts faced with the question of the voluntariness of a confession:

"The procedure to be followed when the voluntariness of a confession is challenged was laid out in *Bradley v. Commonwealth*, Ky., 439 S.W.2d 61 (1969). On a motion to suppress, the trial court must conduct an evidentiary hearing in chambers. Only if he is satisfied from substantial evidence that the confession was voluntary (and is not otherwise inadmissible) can it then be heard and considered by the jury. Constitutionally, this is all that is required, and if the trial court's determination is supported by substantial evidence it would be conclusive, cf. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), but for the additional protection prescribed in *Bradley* to the effect that if the defendant chooses to carry the question to the jury he may do so with the benefit of an admonition that the evidence shall not be considered unless the jury believes that the confession was made voluntarily and free of coercion." *Britt v. Commonwealth*, Ky., 512 S.W.2d 496 (1974).

It is obvious that the trial court followed the procedure outlined in *Britt*, supra. Thus, the trial court's ruling was not clearly erroneous.

Brown's final argument is a constant recurring one. It relates to the introduction of photographs. The Commonwealth's Attorney introduced ten photographs, all of which were admitted in evidence as exhibits. Seven of the photographs depict Daley's neat, well-stocked market (the scene of the crime). Another is a photograph of the

meat counter at the back of the store near the cash register. It shows the area where fingerprint powder had been applied to the meat counter. No objection was made to the introduction and admission of these eight photographs. The other two pictures show the body of Williams [the deceased]. When these were introduced, counsel for Brown strenuously objected to their introduction and admission. He contended the pictures were "gruesome," and were not essential evidentiary material. The first photograph shows the body of Williams lying on the floor, face up, with blood on the front of his shirt in the area of his upper chest. The second photograph shows Williams' body at the morgue. His shirt was open, exposing his bare chest. It depicts a wound in his upper chest where the bullet that caused death entered his body. The trial court overruled Brown's objection and denied his motion for a mistrial.

Photographs of a victim of a homicide or the scene of a crime constitute demonstrative evidence which is often an aid to the jury in the trial of a case. It is true that "one picture is worth more than 10,000 words."[2] A famous author phrased it in this fashion, "A picture shows me at a glance what it takes dozens of pages of a book to expound."[3]

In this advanced technological age of television, movies, and the news media, children, as well as adults, are exposed to more gruesome, repulsive and nauseous depictions of human misery and tragedy than that shown in prosecutions for murder, manslaughter or other types of homicide.

On a November day in 1963, the viewing public witnessed the assassination of President Kennedy as his motorcade made its way through the streets of Dallas, Texas. Subsequently, the public witnessed the murder of the President's assassin as he was brought from the jail to a courtroom. Five years later, the public again witnessed the assassination of Attorney General Robert Kennedy. Later, the violent death of Martin Luther King was shown to the view-

---

2. Chinese Proverb.

3. Turgenev, *Fathers and Sons*, Ch. 5 (1962).

ing public, as well as the abortive attempt to kill the governor of Alabama. In today's society, violence and tragedy walk hand in hand. They are not strangers to the viewing public and prospective jurors.

█ The statement in Brown's brief, "It would appear that in this jurisdiction all photographs of the scene of the crime are now admissible no matter how heinous the crime," is accurate to the extent that a photograph that is otherwise admissible does not become inadmissible simply because it is gruesome and the crime is heinous. Thus the trial court properly admitted in evidence the photographs about which complaint is made.

The judgment is affirmed.

All concur.