RENDERED: JANUARY 6, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0716-MR

COMMONWEALTH OF KENTUCKY                APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE AUDRA J. ECKERLE, JUDGE
v.                ACTION NO. 20-CR-001322

TYRIN CHRISTOPHER
CURRINGTON                APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, COMBS, AND GOODWINE, JUDGES.

GOODWINE, JUDGE: The Commonwealth of Kentucky ("Commonwealth")

appeals from a Jefferson Circuit Court order suppressing Tyrin Christopher

Currington's ("Currington") statements made during an interview with the police.

After careful review, finding no error, we affirm.

On July 4, 2020, at approximately 11:47 p.m., Louisville Police

Department officers responded to a reported shooting on Alba Way in Jefferson

County. Currington was heavily intoxicated and suffered a gunshot wound to his right upper arm/shoulder area. The victim, Jose Hernandez ("Hernandez"), suffered a gunshot wound to his chest. Both were taken to University of Louisville Hospital where Hernandez died of his injury.

Currington was treated for approximately four hours. His blood alcohol level was .399 around the time he arrived at the hospital. Currington was given four doses of opiate-based narcotics during his treatment. He was released to law enforcement at 5:00 a.m. on July 5, 2020.

When Currington arrived at the police department ten to fifteen minutes later, he was taken to an interrogation room for questioning regarding his role in Hernandez's death. He ultimately made a statement regarding possession of a gun and shooting Hernandez. Currington was charged with and later indicted for murder and being a felon in possession of a handgun.

On January 24, 2022, Currington moved to suppress his statement to police. The circuit court heard the motion on February 22, 2022. The Commonwealth called lead Detective Abigail Christman, and Currington called Mr. Kevin McCullum, a nurse practitioner. The Commonwealth submitted a recording of Currington's statement to police for the circuit court to watch in camera, to which Currington agreed. Currington's medical records were

introduced, and counsel was advised to append any relevant material to memoranda as needed.

Detective Christman testified that she went directly to the hospital when she learned of the shooting at 11:47 p.m. She was told Currington was intoxicated and was combative and aggressive with medical staff, but she did not speak to him at the hospital. After Currington was discharged and released to the police at 5:10 a.m., it took about ten to fifteen minutes to get to the police station. He was taken directly to an interview room. At the beginning of the interview, Currington complained of pain, but the detective did not believe it impacted him.

Detective Christman and Sgt. Bird read Currington his *Miranda*[1] rights and gave him a copy to follow along. Although Currington had some questions, he stated several times that he understood his rights. The detective admitted Currington said some odd things during the interview. However, she testified Currington appeared to be lucid and understood what was happening around him. Currington walked into the interview room on his own two feet and gave no indication that he was under the influence of anything and did not seem like he was hallucinating.

On cross-examination, Detective Christman said she knew Currington had been taken to the trauma unit at the hospital for his gunshot wound. She was

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

told Currington had been drinking at a Fourth of July celebration. When she interviewed Currington, she was unaware if he had ever been read his *Miranda* rights before or if he had a prior record.

Detective Christman acknowledged Currington was difficult at the beginning of the interview. He insisted the detective already knew his name and date of birth. Detective Christman testified that despite reading the rights and waiver form to Currington, he refused to sign it. She also testified he was confused about the form, specifically when the detective read the form in first-person. Currington believed she was talking about her rights instead of his. Currington told the detective the part of the form about waiving his right to an attorney was "bullshit because that is what y'all always say." Video Record ("VR") 2/22/22; 1:41:26-29. Currington needed help reading specific phrases, and at the end of the first reading, he asked if he had to have a lawyer to sign the waiver form.

Currington abruptly changed the subject and began to talk about the shooting. Sgt. Bird stopped him and said they could not speak to him unless he waived his rights. Currington asked, "What do you mean, waive my rights?" *Id.* at 1:42:40-43. Bird again tried to explain the waiver and asked Currington if he would orally waive his rights. Currington said he was "not signing shit" and "that makes no sense." *Id.* at 1:44:04-37. Ultimately, Currington gave a statement to the officers despite never explicitly waiving his *Miranda* rights.

The defense called as an expert witness Kevin McCullum ("McCullum"), a licensed nurse practitioner, who had experience in the trauma unit at University of Louisville Hospital and currently worked for University of Louisville Physicians. Although McCullum never treated or examined Currington, he reviewed Currington's medical records from the shooting and the various medications given to him during the short time he was at the hospital. According to the medical records, Currington arrived at the hospital at 12:41 a.m., approximately four hours before the interview, with a gunshot wound. The wound was significant enough that he was admitted to the trauma unit.

Currington had a toxicology screen at 1:05 a.m. His blood alcohol level was .399. A blood alcohol level of .4 is lethal, so Currington entered the hospital near the lethal dose. McCullum testified the typical symptoms of a person with a blood alcohol level of .399 included impulsivity, coma-like state, aggressiveness, impaired motor coordination, and severe confusion.

Currington was given four doses of various narcotics during his four-hour hospital visit. First, Currington was given Ketamine for agitation when he arrived at the hospital. McCullum testified typically a patient on Ketamine would experience confusion, mental fog, and drowsiness. When coming off Ketamine, patients generally experience hallucination, a dreamlike state, and confusion.

Second, Currington was given midazolam (Versed), a benzodiazepine at 4:07 a.m. It can cause amnesia, forgetfulness, grogginess, and sleepiness.

Finally, Currington was given two shots of Fentanyl, a Schedule II opioid used for pain. The first shot was administered at 4:37 a.m. (23 minutes before Currington was discharged), and the second shot was given at 4:55 a.m. (five minutes before Currington was discharged to police). McCullum testified Fentanyl generally causes sleepiness, drowsiness, grogginess, high, and euphoria.

McCullum testified the combination of having a gunshot wound, a near lethal blood alcohol level of .399, and the administration of four narcotics would be "life altering." VR at 2:10:07-10. This combination would cause severe mental compromise, severe confusion, incoherence, impaired motor skills, and respiratory distress.

McCullum also testified regarding when the effects of the narcotics would subside. He stated Versed stays in the system for two hours, and Fentanyl lasts for one to two hours. Thus, Currington would have been under the influence of those two drugs when the interview began at 5:15 a.m.

On cross-examination, McCullum stated drugs affect people differently. However, hardly anyone could tolerate the amount of alcohol in his system. McCullum stated Currington was discharged from the hospital with no aftercare.

At the conclusion of the hearing, the circuit court allowed parties to submit briefs on the issue and agreed to view the taped interview of Currington. On May 2, 2022, the circuit court entered an order suppressing the statement finding:

> In this case, there is no real question that Defendant was in custody and subjected to interrogation, as he was handcuffed at the police station. Defendant was very heavily intoxicated. Indeed, his blood alcohol level was nearly at a lethal stage. The video shows clearly that Defendant did not understand the questions Christman and Bird asked him. They each asked Defendant about his rights on numerous occasions, and Defendant repeatedly failed to voice any understanding. He said specifically: "That makes no sense." And he added: "I don't know what you mean." He then asked them about snitching on someone else, which was a completely different topic about which neither officer had questioned him. While defendant did state once that "I know what my rights are," he still refused to sign the form. Christman knew Defendant was intoxicated and belligerent. And she admitted his behavior was odd. Indeed, it was incoherent and disconnected from reality. The video clearly shows that Defendant did not have even a cursory understanding of his rights. While the officers appropriately read Defendant his rights several times, the evidence showed that he did not comprehend them. Accordingly, under the totality of the circumstances, he could not possibly have made a knowing, voluntary, and intelligent waiver of said rights. Therefore, his statements to the police, and the entire interview, are suppressed.

Record ("R.") at 134.

This appeal followed.

On appeal, the Commonwealth argues Currington was not so impaired that he was unable to knowingly, willingly, and voluntarily waive his rights. We apply a two-step standard of review on a motion to suppress:

> "First, we review the trial court's findings of fact under a clearly erroneous standard. *Welch v. Commonwealth*, 149 S.W.3d 407, 409 (Ky. 2004). Under this standard, the trial court's findings of fact will be conclusive if they are supported by substantial evidence. RCr[2] 9.78; *Canler v. Commonwealth*, 870 S.W.2d 219, 221 (Ky. 1994). We then "conduct a *de novo* review of the trial court's application of the law to the facts to determine whether its decision [was] correct as a matter of law." *Payton v. Commonwealth*, 327 S.W.3d 468, 471-72 (Ky. 2010) (quoting *Commonwealth v. Neal*, 84 S.W.3d 920, 923 (Ky. App. 2002)).

*Smith v. Commonwealth*, 410 S.W.3d 160, 164 (Ky. 2013). Additionally, we give "due regard . . . to the opportunity of the circuit court to judge the credibility of the testifying officer and to assess the reasonableness of the officer's inferences." *Commonwealth v. Perry*, 630 S.W.3d 671, 674 (Ky. 2021).

First, the Commonwealth argues that although Currington "may have been somewhat impaired, his impairment did not reach the level required for suppression of his statement. The Commonwealth cites *Smith*, 410 S.W.3d 160, in support of its argument, which contradicts its position. In *Smith*, the appellant was under the influence of alcohol when he was interviewed by the police. *Id.* at 163.

---

[2] Kentucky Rules of Criminal Procedure.

He signed a written acknowledgement that he understood his rights and admitted to committing crimes. *Id.* On appeal to the Supreme Court of Kentucky, appellant argued "the interview should have been suppressed because he was so intoxicated at the time of the interview that his statements were not knowingly, willingly, and voluntarily made. *Id.* at 163-64.

Our Supreme Court opined:

Generally speaking, no constitutional provision protects a drunken defendant from confessing to his crimes. "The fact that a person is intoxicated does not necessarily disable him from comprehending the intent of his admissions or from giving a true account of the occurrences to which they have reference." *Peters v. Commonwealth*, 403 S.W.2d 686, 689 (Ky. 1966). As noted by Justice Palmore in *Britt v. Commonwealth*, "[i]f we accept the confessions of the stupid, there is no good reason not to accept those of the drunk." 512 S.W.2d 496, 500 (Ky. 1974). "We are not at all persuaded that it would make sound law to hold that the combination of intoxication and police custody must add up to a violation of due process." *Id.* at 501.

*Id.* at 164.

There are two exceptions to this general rule that warrant consideration in determining whether a defendant's waiver of his right to remain silent was knowing, voluntary, and intelligent. "First, intoxication may become relevant because a 'lesser quantum' of police coercion is needed to overcome the will of an intoxicated defendant." *Id.* (citations omitted). Second, and applicable here, "a confession may be suppressed when the defendant was 'intoxicated to the

degree of mania' or was hallucinating, functionally insane, or otherwise 'unable to understand the meaning of his statements.'" *Id.* (citations omitted). Under this exception, "suppression may be warranted not because the confession was 'coerced' but because it is unreliable." *Id.* 164-65. In *Smith*, our Supreme Court held neither exception applied as there was no evidence of coercion by the police, and appellant was not "so intoxicated that his statement was inherently unreliable." *Id.* at 165.

Based on our review of the record, the circuit court weighed the credibility of the testimony in deciding to suppress Currington's statement. Though Detective Christman testified Currington stated he knew what his rights were, she also testified regarding his confusion about the waiver form and orally waiving his rights. Additionally, Currington presented expert testimony that the drugs and alcohol in his system would impair his thought process and cause severe mental compromise. Thus, based on the totality of the circumstances, substantial evidence supports the circuit court's factual finding that Currington was so intoxicated that he did not comprehend his rights, and we lack the authority to make our own factual findings. *Perry*, 630 S.W.3d at 677.

Additionally, applying *Smith*, the evidence supports a legal conclusion that Currington was so intoxicated that he could not understand the meaning of his statements. *Smith*, 410 S.W.3d at 164. His statement was "inherently unreliable"

and not knowingly, willingly, and voluntarily made. *Id.* at 165.  Thus, the circuit court correctly suppressed Currington's interview with police.

For the foregoing reasons, we affirm the order of suppression of the Jefferson Circuit Court.

ALL CONCUR.


BRIEFS FOR APPELLANT:

Daniel Cameron
Attorney General of Kentucky

Jeanne Anderson
Special Assistant Attorney General
Louisville, Kentucky

BRIEF FOR APPELLEE:

Shannon Dupree
Frankfort, Kentucky