# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: FEBRUARY 19, 2026
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0353-MR

MATTHEW KELLEY                                              APPELLANT

                 ON APPEAL FROM CARTER CIRCUIT COURT
V.                  HONORABLE REBECCA K. PHILLIPS, JUDGE
                            NO. 18-CR-00295

COMMONWEALTH OF KENTUCKY                           APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Matthew Kelley appeals from his conviction and sentence for manslaughter by the Carter Circuit Court following his jury trial. Kelley shot his wife's grandfather. Kelley argues that his motion to suppress his confessions should have been granted and that palpable error occurred when his wife and an officer were allowed to testify that Kelley's demeanor was not consistent with innocence. We affirm.

## I. FACTUAL AND LEGAL BACKGROUND

Kelley, his wife Heather Kelley (Heather), Heather's four children, and Heather's grandparents, Bradley Vernon Duncan and Connie Duncan (Connie), lived together in the Duncans' home. On the evening of October 6, 2018, Kelley and Heather were drinking vodka in their room and talking.

During the night, after midnight on October 7, 2018, Duncan got out of bed because he believed Kelley and Heather were arguing. According to Heather, Duncan misunderstood Kelley's and Heather's prior conversation, as they were not arguing.

While Duncan and Kelley argued out in the hall, Heather tried to intervene. Heather testified that during this argument, Duncan ended up calling Kelley "a piece of crap and a liar."

Connie got out of bed and found the others in the hall. According to Connie, there was light in the hall from Heather's bedroom door and from the living room light.

According to Heather, Kelley returned to their room and came out with a gun, told Duncan he "was sick of being called a liar" and aimed his gun at Duncan. After Duncan said, "Don't you point that gun at me," Kelley shot Duncan. The bullet hit Duncan in the mouth and exited his lower neck area, killing him.

Heather called 911 but was unable to talk on the phone. Kelley communicated with the dispatcher and reported that someone had "run up on" him, he "didn't know who it was[,]" but later said he shot Duncan because he "just came up on" Kelley, "cussing and carrying on." Kelley said he knew he would "pay for [his] [explicative] actions."

The police responded. Kelley was cooperative. Detective Jeff Kelley (Detective Jeff)[1] interviewed Kelley twice outside the residence, before and after interviewing Heather and Connie. Both times Detective Jeff interviewed Kelley, Kelley signed a *Miranda*[2] waiver form and Detective Jeff recorded audio of their conversation. The audio recordings of these interviews were presented at trial. Detective Jeff could smell alcohol on Kelley's breath, but Kelley's responses were cogent, and Detective Jeff had no concerns about interviewing him.

Kelley provided two different explanations of what had occurred in his police interviews. In the first interview, Kelley reported hearing "hooting and hollering" in the hallway and "a man's voice" that he "did not recognize." Kelley stated that after hearing "a big thump" he left his bedroom with a gun and saw Heather "get bashed against a wall." Kelley reported that he couldn't see who the male was because there were no lights on and he raised his weapon and told the unknown man to stop, but the man "took two steps toward [Kelley]" and in response Kelley "flipped the safety off" and fired just after the light came on.

In the second interview, Detective Jeff told Kelley that his story was different from that provided by Heather and Connie and appealed for him to be honest and not make excuses like a child that broke something. Kelley then provided a different version of the events, stating that he "stepped into" an

[1] Detective Kelley is not a relation of Kelley. To avoid confusion between the appellant and the detective, we refer to the detective as Detective Jeff.

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

3

argument between "Heather and her grandfather[,]" Duncan "got smart-a**ed, and [Kelley] was already in a p*ssed off mood anyway." So, when Duncan "kinda nudged [Heather] out of the way," Kelley "stepped forward," Duncan "drawed back" like "he was going to hit [Kelley], and [Kelley] shot him."

Kelley clarified he had the gun because his intention was to "pistol whup 'em" but that "[w]hen [he] raised [his] weapon, the safety was already off, [and the] hammer was already back. When [he] raised it to go bust 'em, it went off."

On October 19, 2018, the grand jury indicted Kelley for capital murder and a superseding indictment for the same crime was filed on November 2, 2018.

The trial and hearings were delayed by the measures to address COVID-19. The trial court denied Kelley's motion to suppress his statements from his two interviews with police.

A four-day trial was held in February 2022. The jury convicted Kelley of the lesser-included charge of first-degree manslaughter and recommended the maximum sentence of twenty years of incarceration.

After the trial, sentencing was delayed.[3] On February 9, 2024, the judgment for manslaughter was imposed, and the trial court sentenced Kelley to twenty years of incarceration in accordance with the jury's recommendation. The trial court also confirmed its prior order denying Kelley's motion to suppress his statements in a written order.

---

[3] It appears that some of this delay was caused by the fact that there was a second criminal prosecution against Kelley.

## II. ANALYSIS

### A. The Motion to Suppress Was Properly Denied.

On April 29, 2020, Kelley filed a motion to suppress all of his statements to police during the two interviews as being involuntary due to his intoxication. A Zoom hearing was held on this motion on January 26, 2021. Detective Jeff and Heather testified, and Kelley introduced the recordings of the interviews into evidence. The parties filed briefs afterwards. On June 27, 2021, the trial court orally denied the motion to suppress.

There was no dispute that Kelley had been drinking. The only questions were how much, whether it had rendered him intoxicated, and whether when combined with police techniques that level of intoxication rendered his confession involuntary. Kelley waived all consideration that his intoxication led to mania and his confession should be excluded on such grounds in both his briefing below and in his appellate brief.

Kelley's blood alcohol level was not tested through a blood or breathalyzer test to establish his intoxication level. No expert testified to his level of intoxication based on the available evidence.

As to the first interview Detective Jeff had with Kelley, Detective Jeff testified that when he encountered Kelley, Kelley was sitting on the tailgate of a pickup. Detective Jeff read Kelley his *Miranda* rights and Kelley signed his agreement on the form.

Detective Jeff noted that Kelley smelled a little bit of alcohol, but he did not smell any alcohol on Kelley until Kelley spoke, and in his experience if

5

someone was very intoxicated, he could smell the odor emanating from the person's body, rather than just on the person's breath. Kelley told Detective Jeff that Kelley had been "hitting the bottle" for about an hour prior to the shooting and started drinking vodka once he got home. While this concerned Detective Jeff, he explained that based on the way Kelley was answering basic questions, the detective did not think that Kelley was too intoxicated to talk, noting that Kelley had no problem sitting upright on the tailgate without being propped up by anything. They sat together on the tailgate and during the interviews nothing out of the ordinary occurred to make Detective Jeff believe that Kelley could not properly be questioned.

In between the interviews with Kelley, Detective Jeff went in the house and interviewed Heather and Connie. Heather and Connie both indicated to him that Kelley had been drinking but was not drunk. Heather confirmed that Kelley had been drinking vodka and only vodka. While Detective Jeff was in the home, he noticed alcohol bottles in the bedroom that Kelley shared with Heather. There were two open whiskey bottles and open beer bottles, but he never saw a bottle of vodka.

As to his second interview with Kelley, Detective Jeff testified that he again read Kelley his rights and Kelley acted the same as in the first interview. Kelley was coherent, able to formulate answers to questions in complete sentences and there was nothing to indicate that he was not understanding. Detective Jeff testified that Kelley still smelled of alcohol in the same way he had before, and while the detective observed that Kelley slurred his speech

6

some, he could not tell if that was just the way Kelley talked or was caused by the alcohol Kelley had imbibed, but based on Kelley's ability to form sentences and speak coherently, he concluded that was just how Kelley talked.

Detective Jeff acknowledged that he could have waited to talk to Kelley until he was sober and stated he would have done so if Kelley had been incoherent, but explained that nothing occurred that indicated to him that Kelley was unable to be questioned. Detective Jeff noted that Kelley never lost his concentration, never indicated he did not understand, and gave accurate information about himself and the people with whom he lived.

Heather testified that Kelley accompanied her to her work at Subway and had a couple of drinks from a 5th of fruit flavored vodka while there. He drove them home and had no problem driving. They arrived home at around 11:30 p.m., they both drank from the same bottle of vodka, and neither of them drank anything else.

Heather stated that she drank more than Kelley, he quit drinking before her, and she finished the bottle. She explained that Kelley did not appear drunk to her, he knew what was going on, he could drink quite a bit, and he drank regularly.

The trial court reviewed the audio recordings of Kelley's and Heather's interviews at the scene.

In Kelley's briefing of his motion to suppress to the trial court, Kelley argued that there was ample evidence he was intoxicated, and his intoxication was relevant as under such circumstances a lesser quantum of police coercion

7

was needed. He also argued that Detective Jeff could have waited until he was sober to interview him.

On June 27, 2021, the trial court orally denied Kelley's motion to suppress.

On February 9, 2024, a written order was entered denying Kelley's motion to suppress. In this order, the trial court specifically found after reviewing the audio recording of the first interview that: (1) the recording supported Detective Jeff's testimony; (2) Kelley responded appropriately to questions regarding his name, social security number, birthdate, wife's birthdate, who lived in the home and his relationship with them; and (3) Kelley "spoke clearly and did not mumble or stumble over his words[,] . . . was not nodding off or otherwise distracted[,]" and "followed the questioning and responded promptly and appropriately, appearing at all times to be lucid and coherent."

As to the second interview, the trial court specifically found: (1) the audio recording supported Detective Jeff's testimony; (2) the variation in defendant's account between the interviews "was not due to the incapacity of the Defendant or an inability to recognize the truth"; (3) the defendant "spoke clearly and coherently . . . in a detailed, complete manner. He was clearly oriented and displayed no confusion, mania, or bizarre behavior."

In terms of the voluntariness of the interaction, the trial court found:

> During both interviews, Detective [Jeff] and the Defendant interacted with one another in a calm and cordial manner. There were no raised voices, threatening statements, or hostile behavior.

At no time did the Defendant indicate that he did not wish to speak with Detective [Jeff] or otherwise ask to stop the interview process.

Regarding Heather's testimony, the trial court noted it was inconsistent at times to the statement she gave at the scene regarding her drinking and Kelley's drinking but "what was consistent was Ms. Kelley's belief that the Defendant was not intoxicated" based on her personal observations.

The trial court noted that Kelley did not testify and found that "no evidence was presented that the Defendant was unable to understand and appreciate the circumstances, unable to reason or exercise judgment, unable to understand questions, unable to respond appropriately, or otherwise unable to make an informed and voluntarily waiver of his rights."

The trial court opined that the recorded audio interviews "overwhelmingly support the conclusion that the Defendant acted voluntarily when submitting to the interviews with Detective [Jeff][,] . . . . was in control of his faculties[,] and was in control of the information that he wished to provide." The trial court noted that Kelley was "engaged . . . throughout both interviews and clearly was alert, attentive, and oriented[,]" responded to questioning "appropriately and readily[,]" and the interactions between Kelley and Detective Jeff were "calm and cordial[.]" The trial court emphasized that it was significant that Kelley "stated on the recording of the first interview that he 'fully' understood his rights[,]" did not dispute Detective Jeff's statement that he understood Kelley wanted to talk, and Kelley never asked to retract his verbal and written waivers.

The trial court concluded that "[Kelley's] consumption of alcohol (and the impact of same) did not rise to a level that would support a conclusion that [Kelley's] statements were coerced or the product of coercion. Aside from intoxication, [Kelley] did not point to other factors that rendered his statements involuntary. A review of the evidence indicates that such factors do not exist."

The trial court noted that there was no evidence that Kelley was surrounded by law enforcement while sitting on the truck tailgate; there was no evidence there were any attempts to intimidate, embarrass, or humiliate Kelley; there was no evidence of physical force or threats used against him; there was no evidence interviewing him in the middle of the night when the officers came on the scene was a scheme to attempt to deprive him of sleep and he also never asked to rest; there was no evidence he was deprived of food, drink, or an opportunity for a restroom break; and there was no evidence that he ever wished to stop speaking. Accordingly, the trial court ruled that the police activity was not coercive, and Kelley participated in the interviews "of his own free will."

"When reviewing a trial court's denial of a motion to suppress, we utilize a clear error standard of review for factual findings and a *de novo* standard of review for conclusions of law." *Jackson v. Commonwealth*, 187 S.W.3d 300, 305 (Ky. 2006). We deem the trial court's findings of fact as conclusive if they are supported by substantial evidence. *Smith v. Commonwealth*, 410 S.W.3d 160, 165 (Ky. 2013).

10

In considering whether a confession is involuntary under the Fifth Amendment,

> [t]he ultimate test of voluntariness lies in an examination of the totality of the circumstances. . . . [A] confession is voluntary unless, under the totality of the circumstances, a defendant's "will has been overborne and his capacity for self-determination critically impaired." *Schneckloth* [*v. Bustamonte,* 412 U.S. 218,] 225 [(1973)]. This requires an examination of both the "characteristics of the accused and the details of the interrogation." *Id.* at 226[.]

*Soto v. Commonwealth,* 139 S.W.3d 827, 847 (Ky. 2004).

"The three criteria used to assess voluntariness are 1) whether the police activity was 'objectively coercive;' 2) whether the coercion overbore the will of the defendant; and 3) whether the defendant showed that the coercive police activity was the 'crucial motivating factor' behind the defendant's confession." *Tigue v. Commonwealth,* 600 S.W.3d 140, 167 (Ky. 2018) (quoting *Dye v. Commonwealth,* 411 S.W.3d 227, 232 (Ky. 2013)).

> As thoroughly explained in *Smith*:

> Generally speaking, no constitutional provision protects a drunken defendant from confessing to his crimes. "The fact that a person is intoxicated does not necessarily disable him from comprehending the intent of his admissions or from giving a true account of the occurrences to which they have reference." *Peters v. Commonwealth,* 403 S.W.2d 686, 689 (Ky. 1966). As noted by Justice Palmore in *Britt v. Commonwealth,* "[i]f we accept the confessions of the stupid, there is no good reason not to accept those of the drunk." 512 S.W.2d 496, 500 (Ky. 1974). "We are not at all persuaded that it would make sound law to hold that the combination of intoxication and police custody must add up to a violation of due process." *Id.* at 501.

> However, there are two circumstances in which a defendant's level of intoxication might play a role in the suppression decision. First, intoxication may become relevant because a "lesser quantum" of police coercion is needed to overcome the will of an

11

intoxicated defendant. *Hill v. Anderson,* 300 F.3d 679, 682 (6th Cir. 2002) (quoting *United States v. Sablotny,* 21 F.3d 747, 751 (7th Cir. 1994)) ("When a suspect suffers from some mental incapacity, such as intoxication or retardation, and the incapacity is known to interrogating officers, a 'lesser quantum of coercion' is necessary to call a confession into question."); *United States v. Haddon,* 927 F.2d 942, 946 (7th Cir. 1991) ("[W]hen the interrogating officers reasonably should have known that a suspect is under the influence of drugs or alcohol, a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession."); *Jones v. Commonwealth,* 560 S.W.2d 810, 814 (Ky. 1977) (intoxication may be a factor that, "under certain circumstances," could cause a confession to be suppressed for lack of voluntariness). Thus, trial courts must consider a defendant's level of intoxication when considering whether police coercion has overborne a defendant's will so as to render the confession involuntary for purposes of the Due Process Clause.

Second, a confession may be suppressed when the defendant was "intoxicated to the degree of mania" or was hallucinating, functionally insane, or otherwise "unable to understand the meaning of his statements." *Halvorsen v. Commonwealth,* 730 S.W.2d 921, 927 (Ky. 1986) (quoting *Britt,* 512 S.W.2d at 499); *Peters,* 403 S.W.2d at 688. Under those circumstances, suppression may be warranted not because the confession was "coerced" but because it is unreliable. *Britt,* 512 S.W.2d at 500 (quoting Marshall & Steiner, *The Confessions of a Drunk,* 59 ABAJ 497 (1973)) ("[W]hen intoxication reaches the state in which one has hallucinations or 'begins to confabulate to compensate for his loss of memory for recent events' . . . the truth of what he says becomes strongly suspect.").

410 S.W.3d at 164-65. As explained in *Britt,* 512 S.W.2d at 500, "[l]oss of inhibitions and muscular coordination, impaired judgment, and subsequent amnesia do not necessarily (if at all) indicate that an intoxicated person did not know what he was saying when he said it. 'In vino veritas' is an expression that did not originate in fancy." Accordingly, "the basic question is whether the accused was[,]" despite the intoxication, "in 'sufficient possession of his

faculties to give a reliable statement.'" *Anderson v. Commonwealth*, 352 S.W.3d 577, 583 (Ky. 2011) (quoting *Britt*, 512 S.W.2d at 500).

The only issue before us is whether Kelley's level of intoxication made a lesser degree of police coercion overcome his will. Kelley did not call an expert and there was no testing on the scene as to his blood alcohol levels. While Kelley focuses on his level of intoxication, argues that the police should have waited until he was sober to interview him, and correctly observes that a lesser degree of police coercion is required to make his statements involuntary under such circumstances, Kelley has failed to present *any* evidence to indicate there was any significant level of police coercion accompanying his agreement to be interviewed or occurring during his interviews. At most, Kelley has established that the police interviews were accompanied by the minimal level of coercion that would accompany any arrest.

The trial court's findings of fact were based on the substantial evidence presented at the suppression hearing and upon review of the recorded interviews themselves. These findings are conclusive that Kelley was able to cogently participate in the interviews and that the interviews occurred while Kelley and the detective were sitting on the tailgate of a truck, without significant police presence nearby, and they had a calm and conversational exchange. Such circumstances are insufficient to establish as a matter of law that Kelley's interview statements were involuntary due to the combination of his intoxication and police coercion.

13

We affirm the trial court's decision to deny Kelley's motion to suppress. The trial court's factual findings were properly supported by substantial evidence and were not, therefore, clearly erroneous. Based on such findings, the trial court's legal conclusions were appropriate.

## B. No Palpable Error Occurred Based on Witnesses' Comments about Kelley's Demeanor after Kelley Killed Duncan.

Kelley states that lay witness opinion testimony provided pursuant to Kentucky Rules of Evidence (KRE) 701 cannot include testimony on the veracity of a witness, citing *Carson v. Commonwealth,* 621 S.W.3d 443, 446 (Ky. 2021). Kelley argues that Heather and Trooper Hamilton were offering improper opinion testimony by commenting on Kelley's veracity where they stated that he did not appear to be upset after shooting Duncan. He compares their testimony to that found to be unduly prejudicial in *Ordway v. Commonwealth,* 391 S.W.3d 762, 775 (Ky. 2013), where a police officer opined that based on his experience, the defendant did not act like someone who had shot someone in self-defense. Kelley agrees that this issue was not properly preserved; therefore, we review for palpable error.

"A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." Kentucky Rules of Criminal Procedure (RCr) 10.26. We will reverse for palpable error if the "probability of a different result or error [is] so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth,* 207

S.W.3d 1, 3 (Ky. 2006). "Relief is only warranted where the error also results in manifest injustice." *James v. Commonwealth*, 681 S.W.3d 60, 69 (Ky. 2023).

During their testimony, Trooper Hamilton and Heather both testified about Kelley's demeanor after shooting Duncan. When Heather was asked about Kelley's emotional state after the shooting, she testified that Kelley "wasn't showing any emotion. It didn't bother him at all . . . . [H]e looked like it was no big deal. No tears . . . not the way I would assume somebody would act after they just shot somebody."

When Trooper Hamilton was asked to describe Kelley's emotional state over the course of the hour he sat with Kelley, he testified "It was actually pretty odd considering the circumstances of what had just happened. He was very calm and collected." Trooper Hamilton stated that he did not recall seeing Kelley cry or become upset.

Both witnesses testified about their observations and offered opinions as to what their observations meant. However, no one testified that Kelley's demeanor meant that his defense was without merit or that his statements about accidentally shooting Duncan or acting in defense of Heather were lies. Instead, Kelley argues that the witnesses' descriptions of Kelley's behavior could lead to an inference that he was guilty.

In *Ordway* a detective implied in his testimony, over the defense's objections "that he had unique expertise in how those who have lawfully engaged in self-protection act, and then authoritatively testified through opinion testimony that Appellant, by the way he acted following the shootings,

15

did not fit that profile." 391 S.W.3d at 775. Our Court held that such "testimony was incompetent because it permitted the police detective to authoritatively suggest how innocent persons behave after they lawfully engage in an act of self-defense, and to then, with some measure of certainty, exclude Appellant from that class of persons based upon his conduct following the shooting." *Id.* at 775-76.

An error similar to that which occurred in *Ordway* does not necessarily satisfy the standard for palpable error, especially where it is not as blatant and there is more evidence of guilt. *See Commonwealth v. Rieder*, 474 S.W.3d 143, 146–47 (Ky. 2015).

As explained in *James*, 681 S.W.3d at 70, while a police officer can properly comment on the defendant's body language and provide observations of the witness's demeanor, such as that the defendant "seemed 'cold,' or that he did not exhibit physical emotion in any way[,]" it is improper for a witness to comment that the defendant "was not 'appropriately distraught'" because such an opinion "ventured beyond the scope of appropriate lay opinion." In *James*, the Court ultimately concluded that reversal for palpable error was not warranted, distinguishing *Ordway* and *Carson*, explaining:

> [The officer] did not testify that [the defendant's] lack of distress fit within any element of the crimes charged or negated his self-defense theory. He did not state or imply that [the defendant] was lying in any way or fabricating his defense. Instead, he stated that [the defendant] did not act in a way that he would expect someone who went through a traumatic event would act.

*James*, 681 S.W.3d at 71.

16

We must consider separately the pure observations the witnesses provided and their lay opinions about the meanings to be attributed to what they observed. Heather and Trooper Hamilton could properly testify about their personal observations about Kelley's reaction. This included Heather testifying that Kelley was not showing any emotion or crying, and Trooper Hamilton testifying that Kelley was calm and did not cry or become upset. This information was pertinent and relevant.[4]

In contrast, it was clear error for Heather and Trooper Hamilton to provide lay opinions as to what Kelley's calm reaction meant. Such statements included Heather's opinion that Kelley's lack of reaction made it seem like killing Duncan "was no big deal" and "didn't bother him at all," and Trooper Hamilton's opinion that Kelley's reaction was "odd." Those opinions exceeded the scope of appropriate lay witness testimony because they implicitly related to whether he was guilty.

However, such opinions, when considering the evidence as a whole and the ultimate verdict and sentence, did not rise to the level of palpable error. There was no question that Kelley had in fact shot Duncan, there was eyewitness testimony to the event, and Kelley himself admitted that he shot Duncan, providing varied reasons for his conduct in the 911 call and in his interviews. While Heather's and Trooper Hamilton's opinions crossed the line into inappropriate lay witness opinion testimony which constituted clear error,

---

[4] The recorded interviews only captured audio and covered a different period than when Heather and Trooper Hamilton interacted with Kelley.

such testimony was not so blatantly improper as to comment directly on Kelley's probable guilt or innocence, such as opining that Kelley's behavior after the shooting meant he intended to deliberately kill Duncan and had no remorse about his conduct.

We additionally note that prejudice was not established. As the jury convicted Kelley of first-degree manslaughter rather than murder, this indicated that the jury must have believed Kelley's defense to some extent rather than being inappropriately swayed by the witnesses' opinions that his calm behavior afterwards was "odd" or indicated that he did not care.

### III. CONCLUSION

Kelley's grounds for appeal are without merit. Accordingly, we affirm the Carter Circuit Court's judgment.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Kathleen K. Schmidt
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Joseph Crawford White
Assistant Solicitor General